# IN THE COURT OF APPEALS OF TENNESSEE AT NASHVILLE

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF MIDDLE TENNESSEE, et al. | ) ) ) | |
| Plaintiffs/Appellants, | ) ) | |
| VS. | ) ) | Davidson Circuit No. 92C-1672 |
| | ) | |
| DON SUNDQUIST, GOVERNOR OF THE STATE OF TENNESSEE, et al., | ) ) ) | Appeal No. 01A01-9601-CV-00052 |
| | ) | |
| Defendants/Appellees. | ) | |

### APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY AT NASHVILLE, TENNESSEE
### THE HONORABLE HAMILTON GAYDEN, JUDGE

For Plaintiffs/Appellants:

Barry Friedman
Vanderbilt University
Nashville, Tennessee

Irwin Venick
Dobbins & Venick
Nashville, Tennessee

Elizabeth B. Thompson
Howrey & Simon
Washington, DC

Barbara E. Otten
Dara Klassel
Roger K. Evans
Planned Parenthood Federation of America, Inc.
New York, NY

Louise Melling
Catherine Weiss
American Civil Liberties Foundation
New York, NY

For American College of Obstetricians and Gynecologists:

Ann E. Allen
American College of Obstetricians and Gynecologists
Washington, DC

Abby R. Rubenfeld
Rubenfeld & Associates
Nashville, Tennessee

For Defendants/Appellees:

John Knox Walkup
Attorney General and Reporter

Andy D. Bennett
Associate Chief Deputy

Michael W. Catalano
Associate Solicitor General

For Dr. Anthony Trabue and Dr. Betty Neff:

J. Russell Heldman
Franklin, Tennessee

## AFFIRMED IN PART; REVERSED IN PART; AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal presents a multifaceted challenge to the constitutionality of Tennessee's abortion statutes. After a physician and a clinic in Knoxville were charged with violating these statutes, two other clinics in Memphis and Nashville, joined by three physicians, filed suit in the Circuit Court for Davidson County seeking declaratory and injunctive relief under the Constitution of Tennessee. The trial court struck down the residency requirement, the waiting period, and the requirement that physicians inform their patients that an abortion is a major surgical procedure. After making its own substantive revisions in the statutory text, the trial court upheld the mandatory hospitalization requirement, the remaining informed consent requirements, and the newly enacted parental consent requirement. We have determined that the trial court erred by revising the text of several provisions. We have also determined that the emergency medical exception enacted by the General Assembly is unconstitutionally narrow, that the combined effect of the waiting period and the physician-only counseling requirement places an undue burden on women's procreational choice, and that the remaining challenged provisions as construed herein pass constitutional muster.

## I.

Tennessee's statutes regulating abortions have not developed in a vacuum during the past twenty-five years. They have been inextricably caught up in the continuing national debate over the scope of a woman's freedom to make profoundly personal decisions concerning whether or not to terminate her pregnancy free from unwarranted governmental intrusion. The United States Supreme Court's abortion jurisprudence has influenced the direction of this debate, and thus, Tennessee's abortion statutes must be considered against a national backdrop that takes into account the federal constitutional principles formulated and applied by the United States Supreme Court.

In 1973, the United States Supreme Court held that women possess a fundamental right to decide whether to terminate a pregnancy. This right springs from their constitutionally protected right of privacy and their liberty interests arising under the Due Process Clause of the Fourteenth Amendment. *See Roe v. Wade*, 410

U.S. 113, 152-55, 93 S. Ct. 705, 726-728 (1973). But as fundamental as these rights are, the Court also held that they are not absolute or unqualified and that they must be measured against the State's important interests in safeguarding health, in maintaining medical standards, and in protecting potential life. *See Roe v. Wade*, 410 U.S. at 154, 93 S. Ct. at 727.

The Court reconciled women's procreational rights with the State's interests in two ways. First, the Court announced that statutes affecting a woman's right to decide whether to terminate a pregnancy must be subjected to heightened scrutiny and should be upheld only when they are narrowly drawn to further a compelling state interest. *See Roe v. Wade*, 410 U.S. at 155-156, 93 S. Ct. at 728. Second, the Court established the trimester framework to govern abortion regulations. During the first trimester, almost no interference with a woman's right to decide whether to terminate a pregnancy was permitted. During the second trimester, the framework allowed regulations to protect the woman's health but not to further the State's interest in protecting potential life. During the third trimester, when the fetus was viable, the framework permitted the states to prohibit abortions unless the life or health of the mother was at stake. *See Roe v. Wade*, 410 U.S. at 163-66, 93 S. Ct. at 731-33.

Rather than ending the abortion controversy, the *Roe v. Wade* decision caused abortion to become one of the most divisive domestic legal issues of our time. *See Planned Parenthood v. Casey*, 505 U.S. 833, 995, 112 S. Ct. 2791, 2882 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part); *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 559, 109 S. Ct. 3040, 3079 (1989) (Blackmun, J., concurring in part and dissenting in part); Earl M. Maltz, *Abortion, Precedent, and the Constitution: A Comment on Planned Parenthood of Southeast Pennsylvania v. Casey,* 68 Notre Dame L. Rev. 11, 27 (1992). State legislatures began to test the limits of the *Roe v. Wade* decision by enacting various restrictions on a woman's right to decide whether to terminate her pregnancy. For its part, the Court used *Roe v. Wade*'s strict scrutiny test to strike down a number of these restrictions.[1] But even while it was invalidating state statutes restricting a woman's

---

[1]*See, e.g., Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 764, 106 S. Ct. 2169, 2180 (1986) (invalidating a requirement of mandatory pre-abortion counseling by a physician using state-prescribed materials discouraging abortion); *City of Akron v.*
(continued...)

right to terminate her pregnancy, the Court also held repeatedly that the states could favor childbirth over abortion by declining to use public funds or facilities to perform abortions.[2]

Tennessee was not unaffected by the *Roe v. Wade* decision. It too had a statute on the books, like the Texas statute struck down in *Roe v. Wade*, that criminalized abortions except to preserve the life of the mother.[3] Realizing that the statute could not pass constitutional muster, the General Assembly enacted a new statute intended to comply with *Roe v. Wade*'s trimester framework.[4] However, the General Assembly limited the right to obtain an abortion under the new statute to women who could demonstrate that they were bona fide residents of Tennessee.[5]

During the next five years, the General Assembly increased the punishment for performing criminal abortions[6] and provided for the medical care and custody of infants born live during an abortion procedure.[7] It also established an informed

---

[1](...continued)
*Akron Ctr. for Reproductive Health*, 462 U.S. 416, 437-39, 449-51, 103 S. Ct. 2481, 2496-97, 2502-03 (1983) (invalidating 24-hour waiting periods and requirements that abortions be performed in hospitals after the first trimester); *Planned Parenthood v. Danforth*, 428 U.S. 52, 69-71, 74-75, 96 S. Ct. 2831, 2841-42, 2843-44 (1976) (invalidating spousal consent requirements and parental vetoes).

[2]*See, e.g., Webster v. Reproductive Health Servs.*, 492 U.S. 490, 507-11, 109 S. Ct. 3040, 3050-53 (1989); *Poelker v. Doe*, 432 U.S. 519, 521, 97 S. Ct. 2391, 2392 (1977); *Maher v. Roe*, 432 U.S. 464, 474, 97 S. Ct. 2376, 2382-83 (1977).

[3]*See* Act of Mar. 23, 1883, ch. 140, 1883 Tenn. Pub. Acts 188 (codified at Tenn. Code Ann. § 39-301 (amended 1973)).

[4]*See* Act of May 14, 1973, ch. 235, 1973 Tenn. Pub. Acts 901 (codified at Tenn. Code Ann. § 39-301 (Supp. 1973)). This statute permitted abortions performed during the first three months of pregnancy with the woman's consent and pursuant to the medical judgment of her attending physician. *See* Tenn. Code Ann. § 39-301(e)(1). It also permitted abortions after three months but before viability if they were performed in a hospital with the woman's consent and pursuant to the medical judgment of the woman's physician. *See* Tenn. Code Ann. § 39-301(e)(2). Finally, the statute permitted abortion during viability if the requirements of Tenn. Code Ann. § 39-301(e)(2) were met and if the woman's physician certified in writing to the hospital and the district attorney general that the abortion was necessary to preserve the life or health of the mother. *See* Tenn. Code Ann. § 39-301(e)(3).

[5]*See* Tenn. Code Ann. § 39-301(f).

[6]*See* Act of Mar. 1, 1974, ch. 471, 1974 Tenn. Pub. Acts 156 (codified at Tenn. Code Ann. § 39-301(c) (Supp. 1974)).

[7]*See* Act of Mar. 20, 1978, ch. 811, 1978 Tenn. Pub. Acts 925 (codified at Tenn. Code Ann. §§ 39-306, -307 (Supp. 1978)).

consent procedure and imposed a waiting period before abortions could be performed.[8]

The first judicial challenge to Tennessee's abortion statutes was filed in the United States District Court for the Western District of Tennessee when Planned Parenthood of Memphis attacked the residency requirement enacted in 1973 and the informed consent and waiting period requirements enacted in 1978. The United States District Court permanently enjoined the enforcement of the residency requirement and continued the temporary injunction against enforcing the waiting period. *See Planned Parenthood of Memphis v. Blanton*, No. 78-2310 (W.D. Tenn. July 14, 1978). In 1979, the General Assembly enacted new informed consent and waiting period requirements designed to respond to the constitutional challenges involved in the pending federal litigation.[9] It also established a parental notification procedure for minors seeking an abortion[10] and placed restrictions on research and experimentation on aborted fetuses.[11]

Within months after the enactment of the 1979 amendments to the abortion statutes, the Chancery Court for Davidson County temporarily enjoined the enforcement of the informed consent and waiting period requirements. After the Attorney General declined to defend the parental notification procedure, the chancery court also found that it was unconstitutional. *See Planned Parenthood of Nashville, Inc. v. Alexander*, No. 79-843-II (Davidson Chan. Oct. 19 & 24, 1979) (no appeal filed). Approximately one and one-half years later, the federal district court in Memphis permanently enjoined the enforcement of the 1978 waiting period statute. *See Planned Parenthood of Memphis v. Alexander*, No. 78-2310 (W.D. Tenn. Mar. 23, 1981).

---

[8]*See* Act of Mar. 23, 1978, ch. 847, 1978 Tenn. Pub. Acts 1078 (codified at Tenn. Code Ann. § 39-302(d) (Supp. 1978)).

[9]*See* Act of Apr. 30, 1979, ch. 287, 1979 Tenn. Pub. Acts 590 (codified at Tenn. Code Ann. § 39-302 (Supp. 1979)).

[10]*See* Act of May 10, 1979, ch. 334, 1979 Tenn. Pub. Acts 762 (codified at Tenn. Code Ann. § 39-302(f) (Supp. 1979)).

[11]*See* Act of Apr. 19, 1979, ch. 183, 1979 Tenn. Pub. Acts 317, (codified at Tenn. Code Ann. § 39-308 (Supp. 1979)).

In 1982 the General Assembly recodified the abortion statutes without substantive change. *See* Tenn. Code Ann. §§ 39-4-201, -208 (1982). Six years later, it established a new parental consent procedure.[12] In 1989, the General Assembly provided for expedited appellate review of judicial decisions to forego parental consent.[13] During the same session, the General Assembly again recodified the abortion statutes but this time made substantive changes in the law. It replaced the 1988 parental consent procedures with the parental notification procedures originally enacted in 1979 that had been invalidated by the Davidson County Chancery Court ten years earlier.[14] The Tennessee Supreme Court later determined that the General Assembly's recodification of the 1979 parental notification procedures repealed the 1988 parental consent procedures by implication. *See Planned Parenthood Ass'n of Nashville, Inc. v. McWherter*, 817 S.W.2d 13, 16 (Tenn. 1991).

The United States Supreme Court's adherence to the trimester framework in *Roe v. Wade* began to waver as the years passed. In 1989, three justices concluded that it was unsound in principle and unworkable in practice, *see Webster v. Reproductive Health Servs.*, 492 U.S. 490, 518, 109 S. Ct. 3040, 3056 (1989); one justice advocated overruling *Roe v. Wade* outright, *see Webster v. Reproductive Health Servs.*, 492 U.S. at 532, 109 S. Ct. at 3064 (Scalia, J., concurring in part and concurring in the judgment); while another justice implied that *Roe v. Wade* should be reexamined at a proper time. *See Webster v. Reproductive Health Servs.*, 492 U.S. at 525-26, 109 S. Ct. at 3060-61 (O'Connor, J., concurring in part and concurring in the judgment). This movement away from the trimester framework prompted the author of the majority opinion in *Roe v. Wade* to declare that a woman's right to terminate a pregnancy was not "secure." *See Webster v. Reproductive Health Servs.*,

---

[12]*See* Act of Apr. 28, 1988, ch. 929, 1988 Tenn. Pub. Acts. 868 (codified at Tenn. Code Ann. §§ 37-10-301, -307 (Supp. 1988)). The United States District Court for the Middle District of Tennessee held that this statute was unconstitutional. *See Planned Parenthood Ass'n of Nashville, Inc. v. McWherter*, 716 F. Supp. 1064 (M.D. Tenn. 1989). However, the United States Court of Appeals for the Sixth Circuit later vacated this decision after the Tennessee Supreme Court held that the 1988 parental notification statutes had been repealed by implication. *See Planned Parenthood Ass'n of Nashville, Inc. v. McWherter*, 945 F.2d 405, 1991 WL 193471 (6th Cir. 1991) (Sept. 30, 1991) (unpublished table decision).

[13]*See* Act of May 24, 1989, ch. 412, 1989 Tenn. Pub. Acts 697 (codified at Tenn. Code Ann. § 37-10-304(g) (Supp. 1989)); Tenn. S. Ct. R. 24.

[14]*See* Act of May 24, 1989, ch. 591, 1989 Tenn. Pub. Acts 1169 (codified at Tenn. Code Ann. §§ 39-15-201, -208 (Supp. 1989)). Compare Tenn. Code Ann. § 39-15-202(f) (Supp. 1989) with Tenn. Code Ann. § 39-4-202(f) (1982).

492 U.S. at 537, 109 S. Ct. at 3067 (Blackmun, J., concurring in part and dissenting in part).

The occasion for re-examining *Roe v. Wade* arrived in 1992 in a case challenging the Pennsylvania Abortion Control Act. In a splintered decision in which the justices issued five separate opinions, seven members of the court chose to abandon *Roe v. Wade*'s trimester framework and strict scrutiny standard. The same four justices who had earlier signaled their dissatisfaction with the *Roe v. Wade* decision concluded that a woman's decision to terminate her pregnancy was not "a 'fundamental right' that could be abridged only in a manner which withstood 'strict scrutiny'." *Planned Parenthood v. Casey*, 505 U.S. 833, 953, 112 S. Ct. 2791, 2860 (1992) (Rehnquist, C.J., concurring in the judgment and dissenting in part). Three other justices rendered a rare joint opinion in which they reaffirmed the "essential holding" of *Roe v. Wade, see Planned Parenthood v. Casey,* 505 U.S. at 846, 112 S. Ct. at 2804 (O'Connor, Kennedy, & Souter, JJ.), but also replaced the trimester framework with an undue burden standard in which the viability of the unborn child plays a prominent role. *See Planned Parenthood v. Casey*, 505 U.S. at 876-77, 112 S. Ct. at 2820-21 (O'Connor, Kennedy, & Souter, JJ.).

Based on the facts before it, the Court unanimously upheld the Pennsylvania statute's definition of "medical emergency." However, retreating from its earlier decisions in *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S. Ct. 2169 (1986) and *City of Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. 416, 103 S. Ct. 2481 (1983), the Court upheld (1) an informed consent procedure that required giving women truthful, nonmisleading information about the nature of the procedure, the attendant health risks as well as those of childbirth, and the gestational age of the fetus, (2) a requirement that physicians provide pre-abortion counseling, and (3) a requirement of a 24-hour waiting period before an abortion could be performed. The Court also upheld a one-parent consent requirement for minors that included an adequate judicial bypass procedure. The only provision that the Court struck down, by a narrow majority of a single vote, was Pennsylvania's spousal notification requirement.

In the meantime, the controversy over Tennessee's abortion statutes began to take concrete form in 1992. After a grand jury in Knoxville indicted a clinic and a

physician for performing an abortion on a minor who was more than three months pregnant, the statutes' opponents filed suit in the Chancery Court for Knox County challenging the statutes' constitutionality.[15] Less than three weeks after the *Planned Parenthood v. Casey* decision, Planned Parenthood Association of Nashville, Inc. and Memphis Planned Parenthood, Inc. filed suit in the Circuit Court for Davidson County seeking a declaration that six provisions of the abortion laws were unconstitutional and requesting an injunction against their enforcement.[16] Later, they filed an amended complaint adding three physicians as plaintiffs who were seeking to represent themselves and their patients.

The trial court conducted a five-day bench trial in October and November 1992. During the course of the next sixteen months, the trial court issued three opinions containing its findings with regard to the constitutionality of the challenged statutes. Specifically, the trial court found that the following four provisions were unconstitutional: the residency requirement in Tenn. Code Ann. § 39-15-201(d), the waiting period in Tenn. Code Ann. § 39-15-202(d), the waiting period for minors in Tenn. Code Ann. § 39-15-202(f), and the requirement in Tenn. Code Ann. § 36-15-202(b)(4) that women be informed that an abortion is a "major surgical procedure." The trial court also determined that Tenn. Code Ann. § 39-15-201(a) and Tenn. Code Ann. § 39-15-201(b)(2) were not unconstitutionally vague. Finally the trial court upheld the remaining challenged provisions after "broadly construing" or "salvaging" them by importing terms into the statutory text that had not been included by the General Assembly.

In November 1994, this court dismissed the first appeal in this case for lack of a final order and remanded the case for further proceedings. While the case was pending in the trial court, the General Assembly revived the parental consent requirement originally enacted in 1988 and codified at Tenn. Code Ann. §§ 37-10-

---

[15]This suit was later transferred to the Chancery Court for Davidson County where it was stayed and held in abeyance pending the outcome of this litigation. *See Emancipation v. McWherter*, No. 92-2221-II (Davidson Chan. Order filed April 21, 1993).

[16]Specifically, the plaintiffs challenged the requirement in Tenn. Code Ann. § 39-15-201(c)(2) that abortions "after three (3) months, but before viability of the fetus" be performed in "a hospital as defined in § 68-11-201"; the prohibition against attempting to procure a miscarriage in Tenn. Code Ann. § 39-15-201(b)(2); the residency requirement in Tenn. Code Ann. § 39-15-201(d); the requirement in Tenn. Code Ann. § 39-15-202(b), (c) that a physician provide state-mandated pre-abortion information; the waiting period required by Tenn. Code Ann. § 39-15-202(d); and the parental notification procedure in Tenn. Code Ann. § 39-15-202(f) (Supp. 1989).

301, -307 and repealed the parental notification requirement in Tenn. Code Ann. § 39-15-202(f).[17] Upon being notified of this legislative development, the trial court initially observed that the revival of the parental consent statutes might render moot its decision concerning the constitutionality of the parental notification procedure in Tenn. Code Ann. § 39-15-202(f). Even though the plaintiffs specifically declined to amend their complaint to challenge the parental consent statutes and requested a ruling on the constitutionality of Tenn. Code Ann. § 39-15-202(f), the trial court entered another order in July 1995 upholding the constitutionality of the new parental consent procedure in Tenn. Code Ann. §§ 37-10-301, -307. The trial court entered an amended final order and judgment in August 1995.

## II.

We will first address a threshold matter concerning the plaintiffs' standing to challenge the requirement in Tenn. Code Ann. § 39-15-201(c)(2) that abortions performed after the first three months of pregnancy must be performed in a hospital. The State asserts that the plaintiffs do not have standing because neither Planned Parenthood clinic currently offers second trimester abortions. The plaintiffs respond in two ways. First, they assert that the plaintiff physicians have standing to challenge the hospitalization requirement on behalf of themselves and their patients. Second, they point out that the Nashville Planned Parenthood clinic has been considering offering second trimester abortions because of "the paucity of those services available in Middle Tennessee."

Standing is a judge-made doctrine used to determine whether a party is entitled to judicial relief. *See Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976); *Metropolitan Air Research Testing Auth., Inc. v. Metropolitan Gov't*, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992). It requires the court to determine whether the party seeking relief has a sufficiently personal stake in the outcome to warrant the exercise of the court's power. *See Browning-Ferris Indus., Inc. v. City of Oak Ridge*, 644 S.W.2d 400, 402 (Tenn. Ct. App. 1982). The primary focus of a standing inquiry is

---

[17]*See* Act of May 26, 1995, ch. 458, 1995 Tenn. Pub. Acts 799 (codified at Tenn. Code Ann. §§ 37-10-301, -307 (1996 & Supp. 1997)).

on the party, *see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 484, 102 S. Ct. 752, 765 (1982), not the likelihood of success of the party's claim. *See Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 2206 (1975); *Flast v. Cohen*, 392 U.S. 83, 99, 88 S. Ct. 1942, 1952 (1968).

As a general rule, parties must assert their own rights and interests and not the rights and interests of third parties in order to have standing. *See Warth v. Seldin*, 422 U.S. at 499, 95 S. Ct. at 2205. Thus, litigants ordinarily establish their standing by demonstrating that they have sustained some actual or threatened injury, that the injury was caused by the challenged conduct, and that the injury is one for which a judicial remedy is available. *See In re Petition of Youngblood*, 895 S.W.2d 322, 326 (Tenn. 1995); *Tennessee Envtl. Council v. Solid Waste Disposal Control Bd.*, 852 S.W.2d 893, 896 (Tenn. Ct. App. 1992); *Metropolitan Air Research Testing Auth., Inc. v. Metropolitan Gov't*, 842 S.W.2d at 615. However, the courts may also grant a litigant standing to assert the rights of third parties (jus tertii) when the litigant has suffered its own direct injury-in-fact and when the concomitant rights of third parties would be diluted or adversely affected by the proceeding. *See Craig v. Boren*, 429 U.S. 190, 195, 97 S. Ct. 451, 455-56 (1976).

The United States Supreme Court has specifically accorded physicians standing to challenge the constitutionality of abortion statutes on behalf of their patients. Recognizing the closeness of the physician-patient relationship, the fact that a woman cannot safely procure an abortion except from a physician, and the difficulties facing women who wish to assert their own claims, the Court concluded that a "physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, [a woman's decision to terminate her pregnancy]." *Singleton v. Wulff*, 428 U.S. 106, 117, 96 S. Ct. 2868, 2875 (1976).

The ability of a physician to perform an abortion in a clinic rather than a hospital affects a woman's exercise of her right to decide whether to terminate her pregnancy. In this case, both the physicians and the clinics have demonstrated a concrete legal interest in the enforcement of the restriction because (1) they risk criminal prosecution if they ignore it and (2) the medical director of the Planned Parenthood clinic in Nashville intends to begin providing abortions at the clinic after

the first three months of pregnancy if the current restriction is invalidated. *See Akron Ctr. for Reproductive Health v. City of Akron*, 479 F. Supp. 1172, 1214-15 (N.D. Ohio 1979), *aff'd in part and rev'd in part on other grounds,* 462 U.S. 416, 103 S. Ct. 2481 (1983) (finding standing when a clinic director expressed a desire to perform abortions after the first trimester). Based on this record, we find that both the Planned Parenthood plaintiffs and the physician plaintiffs have standing to challenge the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2).

## III.

We turn next to the role that courts should play in litigation challenging the constitutionality of a state statute. In this case, the trial court undertook to "salvage"[18] the statute by broadly interpreting several of its challenged provisions. By doing so, the trial court exceeded its proper role in at least three instances and thereby usurped prerogatives exclusively within the province of the General Assembly.

## A.

The trial court manifested a keen interest throughout the proceedings in reconciling Tenn. Code Ann. §§ 39-15-201, -202 with current medical practice. It appointed experts in accordance with Tenn. R. Evid. 706[19] and aggressively questioned the witnesses concerning their understanding of proper medical practice. The trial court frequently signaled its intention to propose revisions to the abortion statutes to conform them to the standards of the American College of Obstetricians and Gynecologists[20] and to reconcile them with the advances in medical science occurring since the statutes were first enacted.[21]

---

[18]In a memorandum elaborating on its first opinion, the trial court observed that "each provision of the statute which was salvaged by the Court is obviously enforceable only as interpreted by the Court in the preceding opinion."

[19]The trial court designated four physicians as court-appointed experts in accordance with Tenn. R. Evid. 706. The two physicians who testified in support of the statutes' constitutionality had tried unsuccessfully to intervene as parties before the trial. The two physicians who opposed the statutes were experts retained by the Planned Parenthood plaintiffs.

[20]*See* American College of Obstetricians & Gynecologists, *Standards for Obstetric-Gynecologic Services* (7th ed. 1989) ("ACOG Standards").

[21]Specifically, the trial court recommended that the General Assembly (1) amend the definition of "hospital" in Tenn. Code Ann. § 39-15-201(c)(2) to include ambulatory surgical centers
(continued...)

In its opinions, memoranda, and orders, the trial court eventually altered the wording and meaning of two portions of Tenn. Code Ann. § 39-15-201 and six portions of Tenn. Code Ann. § 39-15-202. It construed the phrase "first three (3) months of pregnancy" in Tenn. Code Ann. § 39-15-201(c)(1) to mean "first trimester" or "fourteen (14) weeks from the first day of a woman's last menstrual period or twelve (12) weeks from conception." The trial court also construed the word "hospital" in Tenn. Code Ann. § 39-15-201(c)(2) to include "ambulatory surgical center" for abortions performed up to eighteen weeks from a woman's last menstrual period.

The trial court construed the requirement in Tenn. Code Ann. § 39-15-202(b) that the woman be "orally informed by her attending physician" of certain statutorily required information to permit physicians to "personally provide the mandated information or personally confirm with the patient that she has been given the information." The trial court also interpreted Tenn. Code Ann. § 39-15-202(b)(5) to require physicians to respond to a patient's request for information by providing a list of services and agencies "reasonably known" to them. In addition, the trial court removed the word "or" between Tenn. Code Ann. § 39-15-202(b)(5) and -202(b)(6), construed the phrase "parents or legal guardians" in Tenn. Code Ann. § 39-15-202(f)(1) to mean "parent or legal guardian," and construed the word "health" in Tenn. Code Ann. § 39-15-202(f)(2)(B) to include "psychological" health. Finally, the trial court interpreted the word "life" in the medical emergency exception in Tenn. Code Ann. § 39-15-202(h) (Supp. 1989)[22] to mean "life and health."

## B.

The constitutional doctrine of separation of powers shapes the courts' power to construe statutes that have come under constitutional attack. *See Ashe v. Leech*, 653 S.W.2d 398, 401 (Tenn. 1983); *Peay v. Nolan*, 157 Tenn. 222, 234, 7 S.W.2d 815, 818 (1928). Tenn. Const. art. II, § 3 vests all legislative authority in the General

---

[21](...continued)
and (2) amend the judicial bypass provision in the parental notification statute to require a second physician's opinion. The trial court was also prepared to appoint one of the State's expert witnesses to prepare a "model code relating to informed consent for abortions in Tennessee."

[22]Tenn. Code Ann. § 39-15-202(h) (Supp. 1989) is currently codified at Tenn. Code Ann. § 39-15-202(g) (1997) as a result of the repeal of Tenn. Code Ann. § 39-15-202(f) in 1995.

Assembly, and Tenn. Const. art. II, § 2 prohibits the other two departments of government from exercising legislative power. The General Assembly's legislative power is limited only by the federal and state constitutions. *See Williams v. Carr*, 218 Tenn. 564, 578, 404 S.W.2d 522, 529 (1966); *Smiddy v. City of Memphis,* 140 Tenn. 97, 104-05, 203 S.W. 512, 514 (1918).

The General Assembly, not the courts, is responsible for the formulation of the state's public policy that is not already embodied in the state and federal constitutions. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997); *Cary v. Cary*, 937 S.W.2d 777, 781 (Tenn. 1996); *Cooper v. Nolan*, 159 Tenn. 379, 386, 19 S.W.2d 274, 276 (1929); *Cavender v. Hewitt*, 145 Tenn. 471, 475, 239 S.W. 767, 768 (1922). Thus, when the constitutionality of a statute has been called into question, the courts must first ascertain the purpose and effect of the statute and then must determine whether the statute conforms to the applicable constitutional requirements. *See Peay v. Nolan*, 157 Tenn. at 235, 7 S.W.2d at 818. The courts will invalidate a statute only when it clearly contravenes either the state or the federal constitution. *See Holly v. City of Elizabethton*, 193 Tenn. 46, 53, 241 S.W.2d 1001, 1004-05 (1951); *Soukup v. Sell*, 171 Tenn. 437, 441, 104 S.W.2d 830, 831 (1937).

A constitutional challenge does not give the courts license to second-guess the General Assembly's policy judgments or to import their own views into the statutory text. *See National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 827, 98 S. Ct. 2122, 2130 (1978). Nor may the courts review the statute's wisdom, necessity, expediency, or desirability. *See Nashville Mobilephone Co. v. Atkins*, 536 S.W.2d 335, 340 (Tenn. 1976); *Dennis v. Sears, Roebuck & Co.*, 223 Tenn. 415, 426, 446 S.W.2d 260, 266 (1969); *Estep v. State*, 183 Tenn. 325, 335, 192 S.W.2d 706, 710 (1946). The remedies for these ills are entrusted to the public, not the courts. *See State v. Lindsay*, 103 Tenn. 625, 640, 53 S.W. 950, 954 (1899); *Henley v. State*, 98 Tenn. 665, 679, 41 S.W. 352, 354 (1897); *State ex rel. Coleman v. Campbell*, 3 Tenn. Cas. (Shannon) 355, 366 (1875).

The traditional canons of statutory construction guide the inquiry into a statute's purpose and effect. The courts ascertain a statute's purpose from the plain and ordinary meaning of its language. *See Westland West Community Ass'n v. Knox County*, 948 S.W.2d 281, 283 (Tenn. 1997); *Riggs v. Burson*, 941 S.W.2d 44, 54

(Tenn. 1997). Because the courts must give effect to unambiguous statutes, *see Spencer v. Towson Moving & Storage, Inc.*, 922 S.W.2d 508, 510 (Tenn. 1996), there is no room for applying the rules of construction when the language is plain and clear. *See Pursell v. First Am. Nat'l Bank*, 937 S.W.2d 838, 842 (Tenn. 1996); *Anderson v. Outland*, 210 Tenn. 526, 532, 360 S.W.2d 44, 47 (1962). Thus, when the words of a statute clearly mean one thing, the courts cannot give them another meaning under the guise of construing them. *See Henry v. White*, 194 Tenn. 192, 198, 250 S.W.2d 70, 72 (1952); *State ex rel. Barksdale v. Wilson*, 194 Tenn. 140, 144-45, 250 S.W.2d 49, 51 (1952); *Mathes v. State*, 173 Tenn. 511, 516, 121 S.W.2d 548, 550 (1938).

The courts also have a duty to use the canons of construction to make sense rather than nonsense out of statutes. *See West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 101, 111 S. Ct. 1138, 1148 (1991); *McClellan v. Board of Regents*, 921 S.W.2d 684, 689 (Tenn. 1996); *Mercy v. Olsen*, 672 S.W.2d 196, 200 (Tenn. 1984). Whenever possible, we must employ the canons to save statutes, not to destroy them. *See Scales v. State*, 181 Tenn. 440, 443, 181 S.W.2d 621, 622 (1944). Accordingly, we begin by presuming that the challenged statute is constitutional. *See Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856, 858 (Tenn. 1996); *In re Burson*, 909 S.W.2d 768, 775 (Tenn. 1995). When faced with a choice between two plausible constructions of a statute, the courts should adopt the construction that avoids undermining the statute's constitutionality. *See Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529-30 (Tenn. 1993); *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990); *Railroad v. Crider*, 91 Tenn. 489, 506, 19 S.W. 618, 622 (1892). But, as helpful as this canon may be in close cases, it does not authorize the courts to rewrite statutes enacted by the General Assembly. *See Chapman v. United States*, 500 U.S. 453, 464, 111 S. Ct. 1919, 1927 (1991); *Heckler v. Mathews*, 465 U.S. 728, 741-42, 104 S. Ct. 1387, 1396 (1984).

In the final analysis, altering or amending statutes is a uniquely legislative prerogative. *See United States v. National Treasury Employees Union*, 513 U.S. 454, 479 n.26, 115 S. Ct. 1003, 1019 n.26 (1995); *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995); *Manahan v. State*, 188 Tenn. 394, 397, 219 S.W.2d 900, 901 (1949). The courts cannot use the canons of construction to amend statutory language. *See Shelby County Election Comm'n v. Turner*, 755 S.W.2d 774, 777-78 (Tenn. 1988); *Town of Mount Carmel v. City of Kingsport*, 217

Tenn. 298, 306, 397 S.W.2d 379, 382 (1965); *McBrayer v. Dixie Mercerizing Co.*, 176 Tenn. 560, 569, 144 S.W.2d 764, 768 (1940). The far better practice is to leave necessary amendments to the General Assembly -- the governmental body constitutionally empowered to make them. *See* 2A Norman J. Singer, *Statutes and Statutory Construction* § 47.38 (5th ed. 1992).

Even though the courts should strive to avoid tampering with the text of a statute, *see United States v. National Treasury Employees Union*, 513 U.S. at 478, 115 S. Ct. at 1019, they are not entirely without authority to modify statutory text. The courts should exercise their authority with unusual caution and only in narrowly defined circumstances because judicial rewriting of statutes provides a disincentive for careful legislative drafting in the first instance, *see Reno v. ACLU*, ___ U.S. ___, ___ n.50, 117 S. Ct. 2329, 2351 n.50 (1997); *Osborne v. Ohio*, 495 U.S. 103, 121, 110 S. Ct. 1691, 1702 (1990), and also creates the risk of inadvertent judicial infringement on a legislative prerogative.

Courts may supply missing words to render a statute intelligible when the context clearly demonstrates that the words were omitted inadvertently or mistakenly. *See Metropolitan Gov't v. Poe*, 215 Tenn. 53, 74, 383 S.W.2d 265, 274 (1964); *Scales v. State*, 181 Tenn. at 443, 181 S.W.2d at 622; *Riggins v. Tyler*, 134 Tenn. 577, 581-82, 184 S.W. 860, 861 (1916). The court may likewise remove words from a statute in order to avoid absurdity as long as the real purpose of the statute is clear. *See City of Bristol v. Bank of Bristol*, 159 Tenn. 647, 649, 21 S.W.2d 620, 621 (1929). The courts cannot, however, rewrite statutes in order to conform them to constitutional requirements, *see Reno v. ACLU*, ___ U.S. at ___, 117 S. Ct. at 2351; *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 645 (1988), or to mold them to conform them to their own views of prudent public policy. *See United States v. Rutherford*, 442 U.S. 544, 555, 99 S. Ct. 2470, 2477 (1979); *Nashville Mobilephone Co. v. Atkins*, 536 S.W.2d at 340.

## C.

We now apply these principles to six of the eight provisions "salvaged" by the trial court.[23]  We find that the trial court construed three provisions correctly but exceeded its authority by essentially rewriting the remaining three provisions.

## 1.
### TENN. CODE ANN. § 39-15-201(c)(1)

Tenn. Code Ann. § 39-15-201(c)(1) states that abortion procedures may be legally performed "[d]uring the first three (3) months of pregnancy" as long as the woman has consented and the procedure is performed by an attending physician.[24] The phrase "first three (3) months of pregnancy" may reasonably be interpreted in more than one way because of ambiguities concerning when the period begins and the duration of the word "month."  Thus, the trial court properly undertook to construe this phrase in a way that gives the fullest possible effect to the General Assembly's purpose and at the same time avoids undermining the statute's constitutionality.

The medical testimony concerning the physiology of human reproduction was remarkably consistent.  Both the physicians who opposed the statutes and those who favored them agreed that the duration of a typical human pregnancy is 265 days and, therefore, that pregnancy cannot be neatly subdivided into three ninety-day periods. They also agreed that the length of a pregnancy could be measured either from the date of conception or from the first day of a woman's last menstrual period[25] and that obstetricians and gynecologists customarily calculated a fetus's gestational age beginning with the first day of a woman's last menstrual period.

---

[23]We need not consider the trial court's construction of Tenn. Code Ann. § 39-15-202(f)(1) or -202(f)(2)(B) because these provisions were repealed by implication in 1989.  *See Planned Parenthood Ass'n of Nashville, Inc. v. McWherter*, 817 S.W.2d at 16.  The trial court's construction of these two provisions has no bearing on the interpretation or enforcement of the parental consent provisions in Tenn. Code Ann. §§ 37-10-301, -307 which were revived by the General Assembly in 1995.

[24]The term "physician" includes only persons licensed to practice medicine or surgery in accordance with Tenn. Code Ann. § 63-6-201(1997) and persons licensed as osteopathic physicians in accordance with Tenn. Code Ann. §§ 63-9-101, -114 (1997).

[25]These two dates are different since conception can occur approximately two weeks after the first day of a woman's last menstrual period.

The physicians also agreed that the term "month" was not medically helpful because the pace of fetal development required shorter measurement intervals and because it could refer to calendar months, thirty-day months, or even four-week months. Accordingly, the physicians testified that obstetricians and gynecologists measured pregnancies in terms of weeks rather than months or trimesters. They also agreed that the term "first trimester" refers to the first fourteen weeks of pregnancy measured from the first day of a woman's last menstrual period, that the term "second trimester" refers to the fifteenth through the twenty-seventh week of pregnancy, and that the term "third trimester" is commonly understood by physicians to include the time of pregnancy remaining after the twenty-seventh week of pregnancy.

The phrase "first three (3) months of pregnancy" in Tenn. Code Ann. § 39-15-201(c)(1) requires judicial construction because it can reasonably be interpreted more than one way. Our examination of the context in which the phrase appears, as well as its legislative history, leads us to conclude that the General Assembly employed the phrase in order to square Tennessee's abortion statutes with the trimester framework first established in the *Roe v. Wade* decision. We find no definitive indication in the statute's legislative history of a clear legislative purpose concerning when this period should begin or precisely whether it should consist of eighty-four days (three four-week months), ninety days (three thirty-day months), or ninety-two days (three calendar months, including two thirty-one day months).

Defining this phrase in a way that will be understood both by laypersons and the medical profession is necessary for two reasons. First, the phrase is an integral part of a statutory scheme that imposes criminal liability on persons who perform abortions inconsistent with its requirements. Second, the difference between eighty-four and ninety-two days can have a profound effect on a woman's decision whether or not to terminate her pregnancy. Accordingly, we find that the trial court, following the weight of the medical evidence presented, could properly define the term "first three (3) months of pregnancy" to mean "the first fourteen weeks of pregnancy measured from the first day of a woman's last menstrual period."

**2.**

**TENN. CODE ANN. § 39-15-202(b)(5)**

The informed consent provision enacted in 1978 required that a woman receive certain statutorily defined information before obtaining an abortion. Tenn. Code Ann. § 39-15-202(b)(5) requires that a woman be informed that if she chooses not to have an abortion that "numerous public and private agencies and services are available to assist her during her pregnancy and after the birth of her child . . . whether she wishes to keep her child or place him [or her] for adoption." It also requires that a woman be informed that "her physician will provide her with a list of such agencies and the services available if she so requests."

The physicians opposing the abortion statutes argued that this provision requires physicians to provide women with a list of every available agency and service providing prenatal, delivery, and post-delivery services to pregnant mothers whether the physician was aware of the agency or not. They complained that physicians who performed abortions could be subjected to criminal liability if they did not know about every single public or private agency that might help pregnant women decide whether to keep their child instead of having an abortion. In response to these concerns, the trial court interpreted Tenn. Code Ann. § 39-15-202(b)(5) to require physicians to inform their patients of the agencies and services "reasonably known to the physician."

The legislative debates concerning this provision do not substantiate the claim that the General Assembly enacted Tenn. Code Ann. § 39-15-202(b)(5) to require physicians to inform themselves of every single public or private agency that could possibly provide services to pregnant women. Likewise, they provide no support for the notion that the General Assembly desired to subject physicians to criminal prosecution if they did not provide their patients, on request, with a list containing each and every one of these agencies. Rather, the General Assembly's purpose was to make sure that women considering a voluntary termination of their pregnancy knew that they would be able to obtain assistance if they decided to continue their pregnancy.

While the phrasing of Tenn. Code Ann. § 39-15-202(b)(5) is awkward, it cannot reasonably be interpreted to require physicians, under penalty of criminal prosecution, to be aware of every single agency that might possibly provide services to pregnant women who desire assistance. The phrase "list of such agencies and the

services available" does not connote a list of all agencies and services but rather a representative list of such agencies and services. Every physician and clinical employee testified that they were aware of agencies providing services to women who decide to continue their pregnancy, and most testified that they already maintained a list of these agencies or that they had referred women to these agencies in the past. Accordingly, the trial court properly construed Tenn. Code Ann. § 39-15-202(b)(5) to require physicians to provide a representative list of agencies reasonably known to them.

## 3.
### THE "OR" FOLLOWING TENN. CODE ANN. § 39-15-202(b)(5)

The physicians opposing the abortion statutes also complain that the inclusion of the word "or" between Tenn. Code Ann. § 39-15-202(b)(5) and Tenn. Code Ann. § 39-15-202(b)(6) renders the entire informed consent provision incomprehensible. In response, the Attorney General introduced evidence that the original legislation enacted by the General Assembly did not contain the word "or" and that it first appeared in the 1982 replacement of Volume 7 of the Code because of an "editorial error." Accordingly, the trial court "struck" the word from the statute.

The original version of the informed consent provision enacted in 1978 did not contain the word "or." *See* Act of March 23, 1978, ch. 847, 1978 Tenn. Pub. Acts 1078, 1079. Nor did the original codified version of the legislation. *See* Tenn. Code Ann. § 39-302 (Supp. 1978). As reflected in the affidavit of the Executive Secretary of the Tennessee Code Commission, the "or" first appeared in 1982 after the Code Commission replaced Volume 7 of the Code. *See* Tenn. Code Ann. § 39-4-202(b) (1982 replacement volume).

These facts illustrate a classic circumstance in which the courts may properly elide a word from a statute. The word was mistakenly included in the codified versions of the statute appearing after 1982 even though it had not been in the legislation enacted by the General Assembly. Including the conjunction "or" in Tenn. Code Ann. § 39-15-202(b) causes the provision to become internally inconsistent and

contrary to the General Assembly's purpose.[26] Because the General Assembly clearly intended that a woman must receive all the information specified in Tenn. Code Ann. § 39-15-202(b) before terminating her pregnancy, the trial court properly elided the "or" between Tenn. Code Ann. § 39-15-202(b)(5) and Tenn. Code Ann. § 39-15-202(b)(6) from the statute.

## 4.
### TENN. CODE ANN. § 39-15-201(c)(2)

Tenn. Code Ann. § 39-15-201(c)(2) requires that "[a]fter three (3) months, but before viability of the fetus," abortions must be performed in a "hospital as defined in § 68-11-201, licensed by the state department of health, or a hospital operated by the state of Tennessee or a branch of the federal government." In response to the testimony that abortions between fourteen and eighteen weeks after the first day of a woman's last menstrual period could be performed safely in ambulatory surgical centers, the trial court construed the word "hospital" in Tenn. Code Ann. § 39-15-201(c)(2) to include ambulatory surgical centers "for abortions performed up to eighteen weeks measured from the first day of a woman's last menstrual period." We have determined that the plain meaning of Tenn. Code Ann. § 39-15-201(c)(2) does not permit this construction.

The hospitalization for "second trimester" abortions originated with the 1973 legislation that rewrote Tennessee's abortion statutes in response to the *Roe v. Wade* decision.[27] At the time the General Assembly enacted this statute, the broad definition of "hospital" included

> any institution . . . represented and held out to the general public as ready, willing and able to furnish care, accommodations, facilities and equipment for the use, in connection with the services of a physician of one (1) or more nonrelated persons who may be suffering from

---

[26]Tenn. Code Ann. § 39-15-202(b) states that a woman must be informed of "the following facts" and then lists the six "facts" that must be provided. This construction means that the woman must be informed of each of the listed facts. However, the conjunction "or" may have either an inclusive or an exclusive sense. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 624 (2d ed. 1995). If "or" is interpreted in its exclusive sense, it would be inconsistent with the provision's apparent inclusive meaning.

[27]*See* Act of May 4, 1973, ch. 235, § 1(e)(2), 1973 Tenn. Pub. Acts 901, 903, allowing abortions "[a]fter three (3) months, but before viability of the fetus, if the abortion . . . is performed . . . in a hospital as defined in Section 53-1301 of this Code."

> deformity, injury, or disease or from any other condition for which nursing, medical or surgical services would be appropriate for care, diagnosis or treatment.

Tenn. Code Ann. § 53-1301(a) (Supp. 1973). The statutes regulating health care facilities did not distinguish between hospital and ambulatory surgical centers, and the definition of "hospital" in Tenn. Code Ann. § 53-1301(a) was broad enough to include ambulatory surgical centers.

In 1976, the General Assembly amended the statutes regulating health care facilities to recognize a new type of facility called an "ambulatory surgical treatment center."[28] These facilities were defined as:

> [A]ny institution, place or building devoted primarily to the maintenance and operation of a facility for the performance of surgical procedures or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy. Such facilities shall not provide beds or other accommodations for the overnight stay of patients. Individual patients shall be discharged in an ambulatory condition without danger to the continued well being of the patients or shall be transferred to a hospital.

Tenn. Code Ann. § 53-1301(o) (Supp. 1976). Three years later, the General Assembly amended the definition of "ambulatory surgical treatment centers" to make clear that patients receiving abortions at these facilities would not be permitted to stay in one of these facilities for more than twelve hours.[29] This current definition of "ambulatory surgical treatment center" is codified at Tenn. Code Ann. § 68-11-201(3).

By its own terms, the definition of "ambulatory surgical treatment center" recognizes that ambulatory surgical treatment centers are not hospitals.[30] This differentiation is also reflected in the Tennessee Health Planning and Resource Development Act of 1987, *see* Tenn. Code Ann. § 68-11-102(4)(A) (1996) (definition of "health care institution" that differentiates between a "hospital" and an "ambulatory surgical treatment center"), and in the regulations of the Tennessee

---

[28]*See* Act of Feb. 25, 1976, ch. 471, 1976 Tenn. Pub. Acts 185.

[29]*See* Act of Mar. 15, 1979, ch. 77, 1979 Tenn. Pub. Acts 123.

[30]Tenn. Code Ann. § 68-11-201(3) states that patients at an ambulatory surgical treatment center must be either discharged in ambulatory condition or transferred to a hospital.

Health Facilities Commission.[31] Accordingly, under the law existing since 1976, hospitals and ambulatory surgical treatment centers are entirely different entities.

When called upon to construe statutes, the courts must presume that the General Assembly is aware of its prior enactments, *see Hicks v. State*, 945 S.W.2d 706, 707 (Tenn. 1997); *Wilson v. Johnson County*, 879 S.W.2d 807, 810 (Tenn. 1994), and of the state of the law at the time it enacts new legislation. *See Riggs v. Burson*, 941 S.W.2d 44, 54 (Tenn. 1997); *Still v. First Tenn. Bank, N.A.*, 900 S.W.2d 282, 285 (Tenn. 1995). Thus, when the General Assembly differentiated between ambulatory surgical treatment centers and hospitals in 1976, we must presume that it was aware of the existing hospitalization requirement for second trimester abortions and, therefore, that it did not intend for second trimester abortions to be performed in ambulatory surgical treatment centers. The General Assembly has revisited the abortion statutes on nine separate occasions since 1976, and on none of these occasions has it altered the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2). Accordingly, the trial court erroneously undertook to amend Tenn. Code Ann. § 39-15-201(c)(2) when it construed it to permit abortions between the fourteenth and eighteenth weeks following a woman's last menstrual period to be performed in ambulatory surgical treatment centers.

## 5.

### TENN. CODE ANN. § 39-15-202(b)

When the General Assembly enacted the informed consent requirement in 1978, it required that a woman obtaining an abortion must be "orally informed by her attending physician" of certain "facts." Following the testimony of several physicians and counselors employed by Planned Parenthood that the pre-abortion counseling and informed consent discussions were performed by persons other than the physician performing the abortion, the trial court construed Tenn. Code Ann. § 39-15-202(b) to require the attending physician either to "personally provide the mandated information" or to "personally confirm with the patient that she has been

---

[31]Tenn. Comp. R. & Regs. r. 0720-2-.01(2) (1994) defines an ambulatory surgical treatment center as "any institution, place or building devoted primarily to the performance of surgical procedures on an outpatient basis." The definition of "hospital" in Tenn. Comp. R. & Regs. r. 0720-2-.01(9) (1995) simply refers to the definition in Tenn. Code Ann. § 68-11-201(21).

given the information." Neither the plain meaning of the words in the statute nor the statute's legislative history supports this construction.

The language of Tenn. Code Ann. § 39-15-202(b) is clear and unambiguous. It requires that a woman's "attending physician" must be the person who provides the required information. On its face, the statute does not permit the physician to delegate his or her statutory counseling and informed consent obligation to any other person. The certainty of the language is reinforced by the substance of the legislators' discussions about this provision on third and final reading. The House sponsor was asked repeatedly, "Who is going to have the authority to do this explaining?". On every occasion, the House sponsor responded that "this will be her attending physician. It will be her doctor that [sic] does this." Accordingly, the trial court erred by importing language into Tenn. Code Ann. § 39-15-202(b) that is not warranted by the text and that was not desired by the General Assembly.

## 6.
## TENN. CODE ANN. § 39-15-202(h) (Supp. 1989)[32]

The trial court's final construction of the abortion statutes relates to the medical emergency provision in Tenn. Code Ann. § 39-15-202(h) that empowers physicians to bypass the informed consent, waiting period, and parental notification provisions in Tenn. Code Ann. § 39-15-202 when the physician certifies that "an abortion . . . [is] necessary to preserve the life of the pregnant woman." The trial court construed Tenn. Code Ann. § 39-15-202(h) to provide an exception not only to the requirements in Tenn. Code Ann. § 39-15-202 but also to those in Tenn. Code Ann. § 39-15-201. It also construed Tenn. Code Ann. § 39-15-202(h) to apply to circumstances where the "health of a woman is threatened." The trial court again exceeded its authority. Its construction of Tenn. Code Ann. § 39-15-202(h) is not supported by the plain meaning of the statutory text or by the legislative history of the abortion statutes.

---

[32]Tenn. Code Ann. § 39-15-202(h) (Supp. 1989) is currently codified at Tenn. Code Ann. § 39-15-202(g) (1997). Since the statute's substance has remained unchanged, we will continue to refer to it as Tenn. Code Ann. § 39-15-202(h), as did the trial court.

The United States Supreme Court held in *Roe v. Wade* that the states have "an important and legitimate interest in preserving and protecting the health of the pregnant woman." *Roe v. Wade*, 410 U.S. at 162, 93 S. Ct. at 731. Accordingly, the Court held that the states could enact regulations of second trimester abortions that reasonably relate to the preservation and protection of maternal health. *See Roe v. Wade*, 410 U.S. at 163, 93 S. Ct. at 732. The Court also held that states may prohibit abortions after a fetus becomes viable "except when it is necessary to preserve the life or health[33] of the mother." *Roe v. Wade*, 410 U.S. at 163-164, 93 S. Ct. at 732.

When the General Assembly rewrote Tennessee's abortion statutes in 1973, it endeavored to comply strictly with the medical emergency requirement in the *Roe v. Wade* decision. The only restrictions placed on abortions prior to viability were (1) that the procedure must be performed by a licensed physician, (2) that the woman must consent to the procedure, and (3) that the procedure must be performed in a hospital if it occurs after three months but before viability. The General Assembly also prohibited abortions after the fetus became viable unless the woman's attending physician certified in writing that the abortion is "necessary to preserve the life or health of the mother." Tenn. Code Ann. § 39-15-201(c)(3).[34]

When the General Assembly began placing additional restrictions on a woman's right to decide whether to terminate her pregnancy, it declined to include medical emergency exceptions as broad as the one in Tenn. Code Ann. § 39-15-201(c)(3). When it first enacted the informed consent and waiting period requirements in 1978, the General Assembly did not include a medical emergency exception.[35] During the next legislative session, however, the General Assembly added two medical emergency exceptions applicable to the informed consent and waiting period requirements. First, Tenn. Code Ann. § 39-15-202(d)(3) permitted a physician to bypass the waiting period if he or she determined that waiting two days "would endanger the life of the pregnant woman."[36] Second, Tenn. Code Ann. § 39-

---

[33]The Court explained in a companion case to *Roe v. Wade* that the term "health" encompasses a woman's psychological as well as physical well-being. *See Doe v. Bolton*, 410 U.S. 179, 192, 93 S. Ct. 739, 747 (1973).

[34]*See* Act of May 4, 1973, ch. 235, § 1(e)(3), 1973 Tenn. Pub. Acts 901, 903.

[35]*See* Act of Mar. 23, 1978, ch. 847, 1978 Tenn. Pub. Acts 1078.

[36]*See* Act of April 30, 1979, ch. 287, § 3, 1979 Tenn. Pub. Acts 590, 591.

15-202(h) provided a medical emergency exception for all requirements in Tenn. Code Ann. § 39-15-202 "in those situations where an abortion is certified . . . as necessary to preserve the life of the pregnant woman."[37]

Under the statutes as enacted by the General Assembly, women may obtain abortions after their fetus is viable if their attending physician certifies that the abortion is necessary to preserve their life or health. However, women cannot receive an abortion until they comply with the informed consent and waiting period requirements in Tenn. Code Ann. § 39-15-202 unless their attending physician certifies that either the informed consent requirement or the waiting period or both would endanger their lives.[38]

The United States Supreme Court has made it clear that states cannot interfere with a woman's decision to have an abortion if continuing the woman's pregnancy would constitute a threat to her health. *See Planned Parenthood v. Casey*, 505 U.S. at 880, 112 S. Ct. at 2822; *Harris v. McRae*, 448 U.S. 297, 316, 100 S. Ct. 2671, 2687-88 (1980); *Roe v. Wade*, 410 U.S. at 164-65, 93 S. Ct. at 732. Thus, the trial court's construction of Tenn. Code Ann. § 39-15-202(h) clearly stemmed from its desire to save the constitutionality of the abortion statutes. While courts should, when possible, construe statutes to avoid the danger of unconstitutionality, *see Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514, 110 S. Ct. 2972, 2980 (1990), they cannot adopt a construction that is not fairly supported by the plain meaning of the statute's language or that is either inconsistent with or not clearly supported by the purpose of the statute.

Medical emergency exceptions to protect the mother's health have been the subject of intense public and legislative debate ever since the *Roe v. Wade* decision was issued. Because of the United States Supreme Court's broad construction of the term "health" in *Doe v. Bolton*, 410 U.S. at 192, 93 S. Ct. at 747, many have argued that to construe medical emergency exceptions to protect a mother's health was to permit "abortion on demand." Even the justices themselves have been divided on this

---

[37]*See* Act of April 30, 1979, ch. 287, § 4, 1979 Tenn. Pub. Acts 590, 591.

[38]Women under the age of eighteen years of age may circumvent the parental consent requirements in Tenn. Code Ann. § 37-10-303 if their physician determines in his or her best medical judgment that "a medical emergency exists that so complicates the pregnancy as to require an immediate abortion." Tenn. Code Ann. § 37-10-305.

issue. *Compare Planned Parenthood v. Casey*, 505 U.S. at 887, 112 S. Ct. at 2826 (stating that even the broadest reading of *Roe* has not suggested there is a constitutional right to abortion on demand) *with Planned Parenthood v. Casey*, 505 U.S. at 995, 112 S. Ct. at 2882 (Scalia, J., concurring in the judgment and dissenting in part) (characterizing *Roe v. Wade* as a mandate for abortion on demand); *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. at 782-83, 106 S. Ct. at 2190 (Burger, C.J., dissenting) (stating that the Court's opinion plainly undermines its earlier rejection of the idea of abortion on demand).

The legislative concern over the potential expansive interpretation of provisions that permit abortions to protect the health of the mother has manifested itself in the context of debates concerning public funding for abortions and, more recently, with regard to legislation proscribing "partial-birth" abortions. In order to avoid the expansive interpretation of the term "health," both federal and state legislators have limited the medically necessary abortions that must be funded under the Medicaid Program, Title XIX of the Social Security Act, to those where physical disorders, injuries, or illnesses would place the woman in danger of death unless an abortion is performed. *See Planned Parenthood Affiliates of Michigan v. Engler*, 73 F. 3d 634, 638 (6th Cir. 1996) (quoting 139 Cong. Rec. S12,581 (daily ed. Sept. 28, 1993) (statement of Senator Hatch)); Act of April 28, 1992, ch. 1018, § 10, Item 4, 1992 Tenn. Pub. Acts 1059, 1090-91 (containing limitations on the use of state funds for abortions); House Bill 3309 / Senate Bill 3307, 100th General Assembly (1998), § 10, Item 4 (limiting the use of state funds to abortions "where an abortion is necessary to save the life of the mother or where the pregnancy is the result of an act of rape or incest"). Likewise, the General Assembly has permitted "partial-birth" abortions only when they are "necessary to save the life of the mother whose life is endangered by a physical disorder, illness or injury." Tenn. Code Ann. § 39-15-209(c) (1997).[39]

---

[39]The Congress enacted H.R. 1833, the "Partial-Birth Abortion Ban Act of 1995" which would have limited partial-birth abortions to circumstances where they were necessary to save the life of the mother. During the United States Senate's debate over an amendment proposed by Senator Boxer that would have permitted partial-birth abortions to protect the mother's health, Senator Smith pointed out that the amendment would be to permit partial-birth abortions on demand. *See* 141 Cong. Rec. S18,074 (daily ed. Dec. 6, 1995) (statement of Senator Smith). The amendment failed, and the President vetoed H.R. 1833 on April 10, 1996. The President stated in his veto message that he would sign the bill if it contained an exception for "serious health consequences." Message to the House of Representatives Returning Without Approval Partial Birth Abortion Legislation, 1 Pub. Papers 567, 568 (April 10, 1996); *see also* 142 Cong. Rec. H3338-01 (April 15,

(continued...)

Despite the testimony of the physicians who supported the statutes being challenged in this case, the terms "life" and "health" in the context of emergency medical exceptions do not mean the same thing as they are commonly understood to mean. While there is consensus that abortions should be permitted to save the life of the mother when she is in immediate danger, there is no consensus concerning whether an emergency medical exception to save a mother's life also includes procedures to protect the mother from physical impairment or psychological impairment that is not life-threatening or procedures to end a pregnancy when childbirth would severely cripple a woman's chance for a successful life herself.

The only reasonable interpretation of the plain meaning of Tenn. Code Ann. § 39-15-202(h) is that it permits bypassing the requirements of Tenn. Code Ann. § 39-15-202 only when "necessary to preserve the life of the pregnant woman." A review of the other statutes pertaining to abortions clearly demonstrates that the General Assembly knows how to provide broader medical emergency exceptions when it chooses to do so. It defined the medical emergency exception in general terms in Tenn. Code Ann. § 39-15-201(c)(3) with regard to third trimester abortions and in Tenn. Code Ann. § 37-10-305 with regard to the parental consent requirement. Thus, we must conclude that the General Assembly purposely decided to limit the scope of Tenn. Code Ann. § 39-15-202(h) to circumstances where bypassing the procedures in Tenn. Code Ann. § 39-15-202 became necessary to preserve the mother's life. Accordingly, the trial court erred by interpreting Tenn. Code Ann. § 39-15-202(h) to apply in circumstances where the health of a woman is threatened.

## IV.

A pivotal issue in this case concerns the appropriate standard for determining the constitutionality of the challenged provisions of Tenn. Code Ann. §§ 39-15-201, -202. Even though the constitutional challenges are based on the Constitution of Tennessee, both parties draw legal support for their positions largely from federal precedents construing the United States Constitution. The Planned Parenthood plaintiffs assert that the Constitution of Tennessee requires nothing less than the strict standard of review employed by the United States Supreme Court in *Roe v. Wade.*

---

[39](...continued)
1996).

The State responds that a woman's fundamental right to refrain from procreating is adequately protected using the "undue burden" standard employed by the United States Supreme Court in *Planned Parenthood v. Casey*.

## A.

The architects of our federal form of government looked to state constitutions to provide the primary protection of individual liberties. Accordingly, neither the Articles of Confederation nor the United States Constitution, as originally adopted, contained a declaration of rights. *See* Robert Allen Rutland, *The Birth of the Bill of Rights, 1776-1791*, at 78, 100, 106 (1955) ("Rutland"). When the First Congress approved the Bill of Rights in 1789, its provisions were drawn largely from state constitutions and bills of rights. *See* Edward Dumbauld, *The Bill of Rights and What It Means Today* 160-65 (1957); Eugene W. Hickock, Jr., *Introduction of the Bill of Rights: Original Meaning and Current Understanding* 17 (Eugene W. Hickock, Jr., ed. 1991); Craig R. Smith, *To Form a More Perfect Union, The Ratification of the Constitution and the Bill of Rights 1787-1791*, at 128 (1993). Thus, most of the provisions in the state and federal declarations of rights share a common ancestry. *See* Paul W. Kahn, *Interpretation and Authority in State Constitutionalism*, 106 Harv. L. Rev. 1147, 1159-61 (1993) ("Kahn"); Rutland, at 13, 74. Although their words differ, these provisions embody restatements of fundamental principles commonly accepted at the time. *See State v. Staten*, 46 Tenn. (6 Cold.) 233, 264 (1869); Wallace McClure, *State Constitution-Making With Especial Reference to Tennessee* 211 (1916); Edward T. Sanford, *The Constitutional Convention of 1796*, Proceedings of the Fifteenth Annual Meeting of the Bar Association of Tennessee 92, 108 (Nashville, Marshall & Bruce Co. 1896).

The primacy of state declarations of rights continued until the ratification of the post-Civil War amendments which, over time, altered the original structure of federalism to allow federal protection for individual rights through the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Today many of our personal liberties are protected by both the state and the federal constitutions.

The relationship between the protections of the state and federal constitutions is well understood. The federal Bill of Rights provides a basic level of protection for

individual liberties, which state laws and constitutional provisions may not violate. *See McDaniel v. Paty*, 435 U.S. 618, 628-29, 98 S. Ct. 1322, 1328-29 (1978); *Girdner v. Stephens*, 48 Tenn. (1 Heisk.) 280, 283-84 (1870); *Union Bank v. State*, 17 Tenn. (9 Yer.) 489, 494-95 (1836). However, state constitutions may provide greater protection or may even protect rights that are not protected by the United States Constitution. *See State v. Barnett*, 909 S.W.2d 423, 430 n.6 (Tenn. 1995); *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992); *Davis v. Davis*, 842 S.W.2d 588, 600 (Tenn. 1992).[40] As a result of the overlapping protections in the state and federal constitutions, many state courts became accustomed to following the United States Supreme Court's lead in articulating constitutional principles. They conformed their interpretations of state constitutional provisions to the United States Supreme Court's interpretation of analogous federal constitutional provisions.

In recent decades, state appellate courts began to place new emphasis on state constitutions as independent sources of protections of personal liberties. The soundness of many of these modern interpretations has been clouded by an ongoing debate concerning the motivations for these decisions[41] and by wide-spread academic criticism of the quality of the scholarship and reasoning.[42] The most widespread concern is that state constitutions have become convenient vehicles for state judges

---

[40]The Tennessee Supreme Court has specifically held that several provisions of the Constitution of Tennessee provide broader protection than their federal counterparts. *See, e.g., State v. Marshall*, 859 S.W.2d 289, 290-91, 294-95 (Tenn. 1993) (holding that the state constitution provides broader protection for speech than the First and Fourteenth Amendments); *State v. Black*, 815 S.W.2d 166, 189, 192-93 (Tenn. 1991) (holding that the state constitution provides different standards for determining what constitutes cruel and unusual punishment); *State v. Jacumin*, 778 S.W.2d 430, 435-36 (Tenn. 1989) (holding that Tenn. Const. art. I, § 7 requires different standards for obtaining a search warrant than does the Fourth Amendment); *Miller v. State*, 584 S.W.2d 758, 759-61 (Tenn. 1979) (holding that the Ex Post Facto Clause of Tenn. Const. art. I, § 11 provides greater protection than the Ex Post Facto Clause in U.S. Const. art. I, § 10, cl. 1).

[41]Some commentators have suggested that these decisions represent efforts by state judges to circumvent the perceived conservatism of the Burger and Rehnquist Courts. *See* Paul M. Bator, *The State Court and Federal Constitutional Liberties*, 22 Wm. & Mary L. Rev. 605, 606 n.1 (1981); Otis H. Stephens, Jr., *The Tennessee Constitution and the Dynamics of American Federalism*, 61 Tenn. L. Rev. 707, 708 (1994); Alan Tarr, *Constitutional Theory and State Constitutional Interpretation*, 22 Rutgers L.J. 841, 845-47 (1991). On the other hand, defenders of these decisions restore state constitutions to their proper place in the continuing constitutional dialogue. *See* Kahn, 106 Harv. L. Rev. at 1154; Frederic S. Le Clercq, *The Process of Selecting Constitutional Standards: Some Incongruities of Tennessee Practice*, 61 Tenn. L. Rev. 573, 586-92 (1994).

[42]*See* James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 761, 763 (1992); David Schuman, *A Failed Critique of State Constitutionalism*, 91 Mich. L. Rev. 274, 276 (1992).

who disagree with the holdings of the United States Supreme Court to transform their personal beliefs and opinions into state constitutional doctrine.

In this climate, the courts should provide thorough explanations of their interpretations of state constitutional provisions. *See Summers v. Thompson*, 764 S.W.2d 182, 188 (Tenn. 1988) (Drowota, J., concurring). Our understanding of the provisions of the Constitution of Tennessee should be guided by the text of the provision, the history of its adoption, our state's unique history and tradition, the fundamental values reflected in the provision, and the United States Supreme Court's construction of similar provisions in the United States Constitution. *See* A. E. Dick Howard, *State Courts and Constitutional Rights in the Day of the Burger Court*, 62 Va. L. Rev. 873, 935-44 (1976). If we are to be the Constitution's guardians[43] and the chief protectors of the fundamental principles it contains,[44] we should not allow constitutional principles to be shaped by judicial ingenuity or by individual judges' personal preferences. *See City of White House v. Whitley*, No. 01A01-9612-CH-00571, 1997 WL 331743, at *10 (Tenn. Ct. App. June 18, 1997) (Koch, J., dissenting), *perm. app. granted* (Tenn. Nov. 24, 1997).[45]

The interpretation of a constitutional provision should begin with its text. *See Shelby County v. Hale*, 200 Tenn. 503, 510, 292 S.W.2d 745, 748 (1956); *Prescott v. Duncan*, 126 Tenn. 106, 128, 148 S.W. 229, 234 (1912); *Bank v. Cooper*, 10 Tenn. (2 Yer.) 599, 621-22 (1831) (Kennedy, J., concurring). The courts may illuminate the meaning of the text by examining the reasonable understanding of the text when the provision was adopted,[46] the practices and usages in existence when the provision was

_____

[43]*See Neely v. State*, 63 Tenn. 174, 185 (1874); *Eason v. State*, 65 Tenn. 466, 477 (1873).

[44]*See Metropolitan Gov't v. Tennessee State Bd. of Equalization*, 817 S.W.2d 953, 955 (Tenn. 1991); *Luehrman v. Taxing Dist.*, 70 Tenn. 425, 438 (1879) (stating that the court's search for meaning of constitutional provisions should not be guided by the judge's own subjective notions of unexpressed constitutional intent); *State ex rel. Witcher v. Bilbrey*, 878 S.W.2d 567, 573 (Tenn. Ct. App. 1994).

[45]The Tennessee Supreme Court heard oral argument in this case on April 2, 1998.

[46]*See Gaskin v. Collins*, 661 S.W.2d 865, 867 (Tenn. 1983); *Hatcher v. Bell*, 521 S.W.2d 799, 803 (Tenn. 1974).

adopted,[47] the common law,[48] and the contemporary legislative and judicial construction of the provision.[49] We may also consider pertinent historical documents including journals of constitutional conventions,[50] prior draft constitutions,[51] and other jurisdictions' constructions of similar constitutional provisions.[52]

Earlier judicial decisions can also elucidate the meaning of a constitutional provision. These precedents provide stability and continuity in our understanding of the constitution's meaning. *See Monday v. Millsaps*, 197 Tenn. 295, 298, 271 S.W.2d 857, 858 (1954); *State ex rel. Pitts v. Nashville Baseball Club*, 127 Tenn. 292, 303, 154 S.W. 1151, 1154 (1913). They should not, however, be used to perpetuate error, *see Board of Educ. v. Shelby County*, 207 Tenn. 330, 365, 339 S.W.2d 569, 584 (1960); *Arnold v. Mayor of Knoxville*, 115 Tenn. 195, 202, 90 S.W. 469, 470 (1905), or principles that no longer work. *See State v. Kendricks*, 891 S.W.2d 597, 603 (Tenn. 1994). The doctrine of stare decisis is not inflexible, *see City of Memphis v. Overton*, 216 Tenn. 293, 298, 392 S.W.2d 98, 100 (1965), and should be used to enable the law to adapt to changing conditions. *See Metropolitan Gov't v. Poe*, 215 Tenn. 53, 80, 383 S.W.2d 265, 277 (1964); *Shousha v. Matthews Drivurself Serv., Inc.*, 210 Tenn. 384, 389, 358 S.W.2d 471, 473 (1962).

## B.

The Tennessee Supreme Court alluded to a woman's federally protected right to terminate her pregnancy several times prior to 1992. *See Smith v. Gore*, 728 S.W.2d 738, 751-52 (Tenn. 1987); *Olson v. Molzen*, 558 S.W.2d 429, 431 (Tenn. 1977). In 1992, the court recognized for the first time that the Constitution of

---

[47]*See Ashe v. Leech*, 653 S.W.2d 398, 401 (Tenn. 1983); *Peay v. Nolan*, 157 Tenn. 222, 230, 7 S.W.2d 815, 817 (1928); *Pope v. Phifer*, 50 Tenn. (3 Heisk.) 682, 687 (1871).

[48]*See Williams v. Taxing Dist.*, 84 Tenn. 531, 535 (1886).

[49]*See State v. Wilson*, 80 Tenn. 246, 265 (1883).

[50]*See State ex rel. Cohen v. Darnell*, 885 S.W.2d 61, 63 (Tenn. 1994); *The Judges' Cases*, 102 Tenn. 509, 519-20, 53 S.W. 134, 136 (1899).

[51]*See State v. Marshall*, 859 S.W.2d at 303 (Reid, C.J., concurring and dissenting); *Paty v. McDaniel*, 547 S.W.2d 897, 902 (Tenn. 1977), *rev'd on other grounds*, 435 U.S. 618, 98 S. Ct. 1322 (1978).

[52]*See State v. Marshall*, 859 S.W.2d at 292-94; *Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516, 519 (Tenn. 1977); *Stoots v. State*, 205 Tenn. 59, 69, 325 S.W.2d 532, 536 (1959).

Tennessee protects a woman's right of procreational autonomy which includes both the right to procreate and the right to avoid procreation. *See Davis v. Davis*, 842 S.W.2d at 601. As fashioned by the court, the right of procreational autonomy is not absolute but is tempered by the State's interest in protecting life after the end of the first trimester of pregnancy. *See Davis v. Davis*, 842 S.W.2d at 602.

The lineage of the right of procreational autonomy protected by the Constitution of Tennessee parallels that of a woman's right to decide whether to terminate her pregnancy recognized in *Roe v. Wade.* The right of procreational autonomy derives from an individual's right of privacy, *see Davis v. Davis*, 842 S.W.2d at 600, which is inherent in the concept of liberty embedded in the Constitution of Tennessee. *See Davis v. Davis*, 842 S.W.2d at 598-99. The concept of liberty is not confined to a specific provision but rather is implicit in Tenn. Const. art. I, § 8 and the "liberty clauses" in the Declaration of Rights. *See Davis v. Davis*, 842 S.W.2d at 599-600.[53]

The Tennessee Supreme Court never held in *Davis v. Davis* that the scope of the right of privacy protected by the Constitution of Tennessee was broader than the right of privacy protected by the United States Constitution. While the court observed that there is no reason to assume complete congruity between the two rights, *see Davis v. Davis*, 842 S.W.2d at 600, it did not conclude that the boundaries between the two rights are, in fact, different. In fact, the court intimated that the state and federal rights are similar when it noted that "the right of procreation is a vital part of an individual's right to privacy. Federal law is to the same effect." *Davis v. Davis*, 842 S.W.2d at 600. The court also relied exclusively on decisions of the United States Supreme Court construing the United States Constitution to describe the nature and scope of the right of procreational autonomy. *See Davis v. Davis*, 842 S.W.2d at 600-02.

---

[53]The court's discussion of the liberty clauses centered on Tenn. Const. art. §§ 1, 2, 3, 7, 19, and 27. Referring to Tenn. Const. art. I, §§ 1 and 2, the court observed that the Constitution of Tennessee is the only state constitution that gives the people the right to resist governmental oppression even to the extent of overthrowing the government. *See Davis v. Davis*, 842 S.W.2d at 599. In fact, Tenn. Const. art. I, §§ 1 and 2 were derived from Md. Dec. of Rights of 1776, art. IV and N.H. Const. of 1784, pt. I, art. X and are not unique. Currently, the constitutions of thirty-one states contain provisions securing the political rights of the people. *See, e.g.,* Ala. Const., art. I, § 2; Ga. Const., art. I, § 2, ¶ 2; Ky. Const., Bill of Rights § 4; Mass. Const., Dec. of Rights, art. VII; N.C. Const., art. I, § 2; Va. Const., art. I, § 3. Two other state constitutions contain provisions similar to Tenn. Const. art. I, § 2. *See* Md. Const., Dec. of Rights, art. 6; N.H. Const., pt. I, art. 10.

While the Tennessee Supreme Court has invoked the right of privacy since deciding *Davis v. Davis*,[54] it has not again addressed the scope of either the right of privacy or the right of procreational autonomy. The only reported case addressing the scope of the right of privacy involved a challenge to the Homosexual Practices Act, Tenn. Code Ann. § 39-13-510 (1991). In that case, a panel of this court held that the statute was unconstitutional because it was not narrowly tailored to advance the State's interest in preventing the spread of infectious diseases. *See Campbell v. Sundquist*, 926 S.W.2d 250, 263-64 (Tenn. Ct. App. 1996). The panel also observed that "the right to privacy provided to Tennesseans under our Constitution is in fact more extensive than the corresponding right to privacy provided by the Federal Constitution." *Campbell v. Sundquist*, 926 S.W.2d at 261.

We do not on this occasion take issue with our colleagues' conclusion in *Campbell v. Sundquist*. However, we do not view their observation concerning the scope of Tennessee's right of privacy to be controlling in this case for four reasons. First, their reliance on *Davis v. Davis* for the proposition that the scope of the state right of privacy is broader than the scope of the federal right of privacy is misplaced. *Davis v. Davis* never held that the contours of the two rights differ, and the Tennessee Supreme Court's analysis based on the uniqueness of the liberty clauses in the Constitution of Tennessee is historically inaccurate.[55] Second, other than its reliance on the historically incorrect language in *Davis v. Davis*, the Court of Appeals cited no other law to support its understanding of the scope of the right of privacy. Third, the *Campbell v. Sundquist* decision did not deal specifically with the right of procreational autonomy. Finally, the fact that the Tennessee Supreme Court denied permission to appeal in *Campbell v. Sundquist* is not a reliable indication that the court concurs with the conclusion with regard to the scope of Tennessee's right of privacy. *See Meadows v. State*, 849 S.W.2d 748, 752 (Tenn. 1993); *Swift v. Kirby*, 737 S.W.2d 271, 277 (Tenn. 1987); *Street v. Calvert*, 541 S.W.2d 576, 587 (Tenn. 1976).

---

[54]*See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717-18 (Tenn. 1997); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993).

[55]*See supra* note 53.

Accordingly, we must determine whether the scope of the right of procreational autonomy is broader than the analogous right of reproductive freedom protected by the United States Constitution. The Tennessee Supreme Court has already noted that these rights spring from common constitutional roots -- the concept of liberty reflected in the state and federal constitutions. *See Davis v. Davis*, 842 S.W.2d at 598. In order to conclude that Tennessee's right to procreational autonomy is broader than its federal counterpart, we must point to material differences in the applicable constitutional language or to other historical or precedential matters that warrant this conclusion. *See City of White House v. Whitley*, 1997 WL 331743, at *13 (Koch, J., dissenting).

The parties challenging the constitutionality of Tenn. Code Ann. §§ 39-15-201, -202 have the burden of demonstrating that the right of procreational autonomy differs in scope and application from the constitutionally protected liberty interests recognized in *Roe v. Wade.* They have failed to carry their burden because even the most expansive reading of *Davis v. Davis* does not substantiate their claim. Both the Constitution of Tennessee and the United States Constitution embody ancient principles that shield private rights from arbitrary governmental interference. *See State v. Staten*, 46 Tenn. (6 Cold.) 233, 245 (1869). In light of the common constitutional lineage of these two rights, and in the absence of any demonstrable basis for a contrary conclusion, we decline to hold that the right of procreational autonomy recognized in *Davis v. Davis* differs in any material way from the fundamental right of a woman to decide whether to terminate her pregnancy first recognized in *Roe v. Wade.*

## C.

Having determined that the state right of procreational autonomy does not differ materially from the procreational right recognized in *Roe v. Wade*, we must now identify the standards to be used to test the validity of the statutory provisions challenged in this case. The formulation of clear legal standards in cases of this sort is essential because standards minimize judicial subjectivity as well as the risk that the height of the bar will be determined by the apparent exigencies of the day. *See Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 785,

-34-

116 S. Ct. 2374, 2406 (1996) (Kennedy, J., concurring in part, concurring in the judgment in part, and dissenting in part).

The Tennessee Supreme Court has not provided us with standards for deciding whether a statute adequately balances the State's interest in protecting maternal health and potential human life with a woman's procreational autonomy. It has, however, pointed to several important similarities between the state and federal rights that point to a workable standard. Like the United States Supreme Court, the Tennessee Supreme Court has recognized that women have a constitutionally protected liberty interest in determining whether to bear or beget a child. *See Planned Parenthood v. Casey*, 505 U.S. at 846, 859, 112 S. Ct. at 2804, 2816; *Roe v. Wade*, 410 U.S. at 153, 93 S. Ct. at 727; *Davis v. Davis*, 842 S.W.2d at 600-01. But, like the United States Supreme Court, the Tennessee Supreme Court has also recognized that the woman's right is not absolute and that the State's interest in protecting maternal health and potential life may justify imposing reasonable limitations on a woman's exercise of her right. *See Planned Parenthood v. Casey*, 505 U.S. at 878-79, 112 S. Ct. at 2821; *Roe v. Wade*, 410 U.S. at 162-64, 93 S. Ct. at 731-32; *Davis v. Davis*, 842 S.W.2d at 602.

In an early effort to strike the appropriate balance between these interests, the United States Supreme Court held in *Roe v. Wade* and in several later cases that state regulations touching on a woman's abortion decision should be subjected to strict scrutiny and should be upheld only if they were drawn in narrow terms to further a compelling state interest. *See Roe v. Wade*, 410 U.S. at 155-56, 93 S. Ct. at 728. Using the strict scrutiny test, the United States Supreme Court invalidated statutes requiring mandatory pre-abortion counseling,[56] spousal consent,[57] parental consent for minors,[58] waiting periods,[59] and hospitalization requirements for abortions occurring after the first trimester.[60]

---

[56]*See Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. at 764, 106 S. Ct. at 2180.

[57]*See Planned Parenthood v. Danforth*, 428 U.S. 52, 69-71, 96 S. Ct. 2831, 2841-42 (1976).

[58]*See Planned Parenthood v. Danforth*, 428 U.S. at 74, 96 S. Ct. at 2843.

[59]*See City of Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. at 449-51, 103 S. Ct. at 2502-03.

[60]*See Planned Parenthood v. Ashcroft*, 462 U.S. 476, 481-82, 103 S. Ct. 2517, 2520 (1983);

(continued...)

In 1989 the Court signaled its disenchantment with its post-*Roe v. Wade* standards when it upheld a statutory restriction against using public employees or facilities to perform non-therapeutic abortions. *See Webster v. Reproductive Health Servs.*, 492 U.S. at 509-11, 109 S. Ct. at 3052-53. Four members of the Court, including Chief Justice Rehnquist and Justices White, Scalia, and Kennedy, noted that *Roe v. Wade's* strict scrutiny standard based on the trimester framework had proved to be unsound in principle and unworkable in practice. *See Webster v. Reproductive Health Servs.*, 492 U.S. at 518, 109 S. Ct. 3056; *Webster v. Reproductive Health Servs.*, 492 U.S. at 532, 109 S. Ct. at 3064 (Scalia, J., concurring in part and concurring in the judgment). Justice O'Connor stated that she was not prepared to address the continuing viability of *Roe v. Wade* in this case. *See Webster v. Reproductive Health Servs.*, 492 U.S. at 525-26, 109 S. Ct. at 3060-61 (O'Connor. J., concurring in part and concurring in the judgment).

The occasion for reconsidering the *Roe v. Wade* standards presented itself in 1992 in a multifaceted challenge to Pennsylvania statutes pertaining to medical emergencies, informed consent, waiting periods, parental consent, reporting and record keeping requirements, and spousal notification. The Court upheld all challenged provisions except the spousal notification requirement, but the justices prepared five opinions reflecting their lack of consensus concerning the appropriate standards. Four justices, including three of the justices who had earlier departed from *Roe v. Wade* in *Webster v. Reproductive Health Servs.*, sustained all the challenged provisions on the basis that they were rationally related to a legitimate state interest. *See Planned Parenthood v. Casey*, 505 U.S. at 966, 979, 112 S. Ct. at 2867, 2873 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part).

The pivotal opinion was prepared jointly by Justices O'Connor, Kennedy, and Souter.[61] While retaining the "essential holdings" of *Roe v. Wade*,[62] the three justices

---

[60](...continued)
*City of Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. at 437-39, 103 S. Ct. at 2496-97.

[61]The joint opinion is the controlling opinion in the case because it embodies the position of the members of the Court who concurred on the narrowest grounds. *See Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977); *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 2923 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

[62]According to the joint opinion, the three essential holdings of *Roe v. Wade* were: (1) the recognition of a woman's right to choose to have an abortion before viability and to obtain it without
(continued...)

rejected *Roe v. Wade's* rigid trimester framework, *see Planned Parenthood v. Casey*, 505 U.S. at 873, 112 S. Ct. at 2818, and also rejected the strict scrutiny standard because it did not give proper weight to the State's interest in maternal health and in potential life. *See Planned Parenthood v. Casey*, 505 U.S. at 875-76, 112 S. Ct. at 2819-20. In the place of the strict scrutiny standard, the joint opinion employed an "undue burden" standard that it explained as follows:

> Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Planned Parenthood v. Casey*, 505 U.S. at 874, 112 S. Ct. at 2819. The joint opinion elaborated on the meaning of an undue burden by pointing out that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Planned Parenthood v. Casey*, 505 U.S. at 877, 112 S. Ct. at 2820.

The joint opinion drew a clear distinction between regulations that placed an undue burden on a woman's ability to decide whether to terminate her pregnancy and those that had the incidental effect of increasing the cost or decreasing the availability of abortions. The justices pointed out that "the fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Planned Parenthood v. Casey*, 505 U.S. at 874, 112 S. Ct. at 2819. They also emphasized that

> What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose. . . . Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion

---

[62](...continued)
undue interference from the state, (2) confirmation of the state's power to restrict abortions after fetal viability if the law contains emergency medical exceptions to protect the life and health of the woman, and (3) recognition that the state has legitimate interests from the onset of pregnancy in protecting the health of the woman and the life of the fetus that may become a child. *See Planned Parenthood v. Casey*, 505 U.S. at 846, 112 S. Ct. at 2804.

> will be upheld if reasonably related to that goal. Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden.

*Planned Parenthood v. Casey*, 505 U.S. at 877-78, 112 S. Ct. at 2821.

As employed in the joint opinion, the undue burden standard requires the court to analyze the factual record to determine whether the challenged regulation, in a large fraction[63] of the cases in which it is relevant, will operate as a substantial obstacle to a woman's choice to undergo an abortion. *See Planned Parenthood v. Casey*, 505 U.S. at 895, 112 S. Ct. at 2830; *see also Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 194 (6th Cir. 1997); *Planned Parenthood v. Miller*, 63 F.3d 1452, 1457 (8th Cir. 1995); *Summit Med. Assocs., P.C. v. James*, 984 F. Supp. 1404, 1449 (M.D. Ala. 1998). Thus, the undue burden standard requires a fact-intensive inquiry based on the record developed in the trial court. *See Planned Parenthood v. Casey*, 510 U.S. 1309, 1310, 114 S. Ct. 909, 910-11 (1994) (Souter, J., denying application for stay); *Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013, 1014, 113 S. Ct. 1668, 1669 (1993) (O'Connor, J., concurring in denial of stay).

Accordingly, the three justices employing the undue burden standard and the four justices employing the rational basis standard departed from *Akron v. Akron Ctr. for Reproductive Health, Inc.* and upheld Pennsylvania's 24-hour waiting period. *See Planned Parenthood v. Casey*, 505 U.S. at 885-87, 112 S. Ct. at 2825-26. They also departed from *Akron v. Akron Ctr. for Reproductive Health, Inc.* and *Thornburgh v. American College of Obstetricians and Gynecologists* to uphold Pennsylvania's informed consent procedure requiring physicians to provide their patients with state-prescribed information, some of which was intended to influence the woman's choice between abortion and childbirth. *See Planned Parenthood v. Casey*, 505 U.S. at 881-85, 112 S. Ct. at 2822-25.

The Court also upheld Pennsylvania's one-parent consent requirement for minors seeking abortions because it had an adequate judicial bypass procedure. *See*

---

[63]Three justices continue to insist that facial challenges to abortion statutes must fail unless there exists no set of circumstances in which the statute can be constitutionally applied. *See Janklow v. Planned Parenthood*, 517 U.S. 1174, ___, 116 S. Ct. 1582, 1584-85 (1996) (Scalia, J., dissenting from the denial of certiorari); *Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1011-12, 113 S. Ct. 633, 633-34 (1992) (Scalia, J., dissenting from the denial of certiorari).

*Planned Parenthood v. Casey,* 505 U.S. at 899-900, 112 S. Ct. at 2832. In addition, the Court upheld Pennsylvania's medical emergency exception, *see Planned Parenthood v. Casey*, 505 U.S. at 879-80, 112 S. Ct. at 2822, as well as the reporting and record keeping requirement. *See Planned Parenthood v. Casey*, 505 U.S. at 900-01, 112 S. Ct. at 2832-33. In a closely divided vote, the Court found that the spousal notification requirement unduly burdened married women seeking abortions who do not wish to notify their husbands and who do not qualify for one of the statutory exemptions to the notice requirement. *See Planned Parenthood v. Casey*, 505 U.S. at 887-98, 112 S. Ct. at 2826-31.

The United States Supreme Court's "reproductive rights" decisions are not binding on this court in this case because the challenge to Tenn. Code Ann. §§ 39-15-201, -202 is based on the Constitution of Tennessee. They can, however, provide helpful guidance for our decision. *See Wright v. Cunningham*, 115 Tenn. 445, 463-64, 91 S.W. 293, 297 (1905). In the absence of a demonstrable basis for holding otherwise, we should favor a construction of the Constitution of Tennessee that is harmonious with analogous provisions in the United States Constitution. *See State v. Jones*, 598 S.W.2d 209, 219 (Tenn. 1980) *overruled on other grounds by State v. Shropshire*, 874 S.W.2d 634, 638 (Tenn. Crim. App. 1993); *Miller v. State*, 584 S.W.2d 758, 763 (Tenn. 1979) (Harbison, J., dissenting).

The Planned Parenthood plaintiffs have failed to present colorable arguments that *Planned Parenthood v. Casey's* undue burden standard is inconsistent with the right of procreational privacy recognized in *Davis v. Davis.* They have not pointed to textual differences or historical or precedential factors that require the continued use of *Roe v. Wade's* strict scrutiny standard. We have considered this issue in light of *Davis v. Davis* and the historical background surrounding the drafting and adoption of Tennessee's Bill of Rights, and we find that *Planned Parenthood v. Casey*'s undue burden standard appropriately balances a woman's right to procreational autonomy with the State's significant interest in protecting maternal health and potential human life. Accordingly, we will use the undue burden standard to determine whether the provisions challenged in this case pass muster under the Constitution of Tennessee.

Except for certain circumstances not applicable here, the persons challenging a statute have the burden of demonstrating its unconstitutionality. *See Hart v. City of Johnson City*, 801 S.W.2d 512, 516 (Tenn. 1990); *Fritts v. Wallace*, 723 S.W.2d 948, 950 (Tenn. 1987). This principle applies to constitutional challenges to abortion statutes. *See* Katherine Kolbert & David H. Gans, *Responding to Planned Parenthood v. Casey: Establishing Neutrality Principles in State Constitutional Law*, 66 Temple L. Rev. 1151, 1155 (1993). Thus, in order to prevail, those challenging the statutory regulations of a woman's right of procreational autonomy must prove either that the General Assembly's purpose in enacting the regulation was to interfere substantially with a woman's choice or that the regulation has interposed a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability. *See Planned Parenthood v. Casey*, 505 U.S. at 878, 112 S. Ct. at 2821.

## V.

We will now consider the constitutionality of the separate statutory provisions at issue in this case. The relative sparsity of probative evidence concerning the effect of these provisions has not escaped our notice. We find the lack of evidence somewhat discomfiting in light of both the profound importance of the issues presented and the United States Supreme Court's unmistakably clear direction in *Planned Parenthood v. Casey* that the undue burden standard requires a thoughtful, fact-intensive analysis of the effect of the challenged provisions on women's procreational autonomy.

### A.

Tenn. Code Ann. §§ 39-15-201, -202 have state-wide application. According to the most current data in the record,[64] abortions are currently being performed in nine of Tennessee's ninety-five counties. Over 90% of these abortions are performed in the State's five most populous areas.[65] Despite this geographic concentration, virtually all of the evidence presented to the trial court relates to abortions performed in Nashville and the operation of the Planned Parenthood clinic in Nashville. While

---

[64]*See* Division of Information Resources, Tennessee Dep't of Health, *Report of Induced Abortions in Tennessee 1990* (June 1992).

[65]Chattanooga, Knoxville, Nashville, Memphis, and the Tri-Cities.

there is some evidence about the operation of the Planned Parenthood clinic in Memphis, the record contains little evidence concerning the availability of abortions in Memphis and no current evidence of any sort concerning the circumstances in Chattanooga, Knoxville, or the Tri-Cities.

To the extent that the statewide statistical data for 1990 remains reliable, 90% of the abortions performed in Tennessee are performed during the first twelve weeks of pregnancy. Approximately 6% are performed during the thirteenth and fourteenth weeks of pregnancy, and only 3.9% of the abortions are performed after the fourteenth week of pregnancy. The statewide data also indicates that 87% of the abortions obtained by Tennessee residents are performed either in a physician's office or in a licensed ambulatory surgical treatment center.[66] Only 2.2% of all abortions are performed in hospitals; however, over 81% of all abortions performed during or after the seventeenth of pregnancy are performed in hospitals.

The data also reveals that a majority of the women who obtain abortions (63.3%) are Caucasian. Approximately 80% of the women are unmarried, and approximately 36% have had a previous abortion. The median age of women obtaining an abortion is twenty-three years old. Approximately 25% of the women are nineteen years old or younger, while 33.9% are between the ages of twenty and twenty-four.

## B.

The Planned Parenthood plaintiffs first assert that the abortion regulations in Tenn. Code Ann. §§ 39-15-201, -202 violate Tenn. Const. art. I, § 8 and Tenn. Const. art. XI, § 8 because they subject women seeking abortions to burdens and obstacles not faced by women seeking other types of medical treatment. Since the right of procreational autonomy is a fundamental right, they argue that the challenged regulations must be strictly scrutinized and that they should be upheld only if they are precisely tailored to serve a compelling governmental interest. The State responds that heightened scrutiny is not required and that Tenn. Code Ann. §§ 39-15-201, -202

---

[66]The Planned Parenthood clinics in Memphis and Nashville are licensed as ambulatory surgical treatment centers.

will withstand an equal protection challenge if there is any reasonably conceivable set of facts that could provide a rational basis for the restriction.

The Equal Protection Clauses of the Constitution of Tennessee require that all persons or entities be treated the same under like circumstances and conditions. *See Genesco, Inc. v. Woods*, 578 S.W.2d 639, 641 (Tenn. 1979); *Mascari v. International Brotherhood of Teamsters*, 187 Tenn. 345, 350, 215 S.W.2d 779, 781 (1948). They do not require persons or things that are, in fact, different to be treated the same. *See Riggs v. Burson*, 941 S.W.2d at 52. The initial burden of determining what is "different" and what is "the same" with regard to statutory classifications resides with the General Assembly. *See State v. Smoky Mountain Secrets, Inc.*, 937 S.W.2d 905, 912 (Tenn. 1996). Any classification that is constitutionally suspect or that interferes with a fundamental constitutional right will be subjected to strict scrutiny, *see State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994); *Harrison v. Schrader*, 569 S.W.2d 822, 825 (Tenn. 1978), and will be upheld only if it is precisely tailored to serve a compelling governmental interest. *See Doe v. Norris*, 751 S.W.2d 834, 842 (Tenn. 1988).

Pregnancy, as a medical condition, provides a natural, appropriate basis for classifying women with regard to the provision of medical services. Pregnant women are distinctly different from other women seeking reproductive or any other type of healthcare. Their pregnancy places additional demands on their bodies, and treatment decisions can affect not only their life and health but also the life and health of the fetus. Because of the dual effect of decisions regarding the treatment of pregnant women, the State has a constitutionally significant interest not only in protecting the mother's life and health but also in the fetus's potential human life. *See Planned Parenthood v. Casey*, 505 U.S. at 846, 112 S. Ct. at 2804; *Planned Parenthood v. Casey*, 505 U.S. at 914-15, 112 S. Ct. at 2840 (Stevens, J., concurring in part and dissenting in part); *Planned Parenthood v. Casey*, 505 U.S. at 929-30, 112 S. Ct. at 2847 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part); *Planned Parenthood v. Casey*, 505 U.S. at 945-46, 112 S. Ct. at 2856 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part); *Roe v. Wade*, 410 U.S. at 162, 93 S. Ct. at 731; *Davis v. Davis*, 842 S.W.2d at 601-02.

Thus, even if a woman's right of procreational autonomy is fundamental for the purposes of an equal protection analysis, the State's interest in maternal health and potential life justifies appropriate state intervention. In equal protection parlance, this intervention must be precisely tailored. In the context of statutory regulations of abortions, the courts should determine whether a particular regulation is precisely tailored using the undue burden standard set out in *Planned Parenthood v. Casey*. Thus, a statutory regulation of abortion will withstand equal protection analysis if it does not impose a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.

## C.

The Planned Parenthood plaintiffs assert that the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2) burdens a woman's right of procreational autonomy without serving a compelling or even legitimate state interest. They insist that elective abortions can be performed safely outside a hospital through the eighteenth week of pregnancy and that the cost of obtaining an abortion in a hospital is significantly higher that the cost of similar procedures in an outpatient clinic or free-standing facility. They also insist that the hospitalization requirement is inconvenient and that hospitals pose additional health risks for women because of the possibility of nosocomial infection.

Our determination of these issues rests on the language of the statute as enacted by the General Assembly, not as embellished by the trial court. Thus, the regulation we are construing at this juncture permits abortions

> After three (3) months, but before viability of the fetus, if the abortion . . . is performed . . . in a hospital as defined in § 68-11-201, licensed by the state department of health, or a hospital operated by the State of Tennessee or a branch of the federal government.

The Planned Parenthood plaintiffs argue that we should review this requirement using the same strict scrutiny standard used by the United States Supreme Court to overturn similar requirements in the past.[67] They insist that the

---

[67]*See City of Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. at 434-439, 103 S. Ct. at 2495-97; *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 481-82,
(continued...)

undue burden standard is inapplicable because the United States Supreme Court did not specifically depart from its earlier decisions concerning hospitalization requirements when it decided *Planned Parenthood v. Casey*. The *Casey* Court did not address its prior decisions concerning hospitalization requirements because this question was not before it. However, the authors of the joint opinion in *Casey* clearly envisioned that the undue burden standard should be used to evaluate the constitutionality of any state regulation affecting a woman's procreational autonomy. We have already determined that the undue burden standard strikes the proper balance between a woman's right of procreational autonomy and the State's important and legitimate interest in protecting maternal health and potential human life. Accordingly, our task is to review Tenn. Code Ann. § 39-15-201(c)(2) to determine whether its hospitalization requirement places a substantial obstacle in the path of women seeking an abortion before fetal viability.

The undue burden standard requires us to consider both the purpose and the effects of the hospitalization requirement. *See Planned Parenthood v. Casey*, 505 U.S. at 877, 112 S. Ct. at 2820. The purpose prong of the standard does not require us to consider the number of women affected by the provision. Instead, it requires us to invalidate the requirement if the persons challenging the statute prove that the General Assembly intended to hinder a woman's procreational autonomy when it enacted the requirement. If, however, the requirement serves a valid purpose not designed to strike at the heart of the right of procreational autonomy, the requirement should be overturned only if its effect is to place a substantial obstacle in the path of a significant number of women seeking an abortion before fetal viability.

The record contains no direct evidence that the General Assembly enacted the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2) to frustrate a woman's exercise of her procreational choice. To the contrary, the evidence illustrates the General Assembly's genuine desire to protect the health of women who seek abortions. Since protecting maternal health is a legitimate and important state interest, *see Planned Parenthood v. Casey*, 505 U.S. at 877-78, 112 S. Ct. at 2821, we find that the evidence does not support a finding of improper legislative motivation.

---

[67](...continued)
103 S. Ct. 2517, 2520 (1983).

In the absence of direct evidence of improper legislative motive, the Planned Parenthood plaintiffs argue that an improper motive may be deduced from the facts that few Tennessee hospitals provide elective abortions after the first fourteen weeks of pregnancy and that the medical community believes that abortions through the first eighteen weeks of pregnancy can be performed safely outside of hospitals. The evidence with regard to the availability issue is meager. What evidence there is relates only to the practice of hospitals in Nashville. There is no evidence concerning hospital policies with regard to post-fourteen week abortions in Memphis, Chattanooga, Knoxville, the Tri-Cities, Cookeville, or Jackson. With regard to Nashville, the evidence shows that between two and four hospitals permit elective post-fourteen week abortions. The evidence also shows that hospital policies regarding post-fourteen week abortions are driven by the risk of complications of these procedures and the shortage of trained physicians willing to perform them, not by Tenn. Code Ann. §§ 39-15-201, -202.

In light of the improvements in medical equipment and procedures during the past twenty-five years, the medical community has reached a consensus that abortions can be performed safely in physicians' offices and outpatient clinics through the fourteenth week of pregnancy.[68] Physicians have also agreed that abortions through the eighteenth week of pregnancy may be performed safely in a free-standing surgical facility.[69] The procedures performed in these facilities may be under general or regional block anesthetic, but the recovery period must be short because patients must be able to be discharged on the same day the procedure is performed.[70] These facilities must maintain the same surgical, anesthetic, and personnel standards that are required of hospitals, including: (a) control of the sources and transmission of infection, (b) infection surveillance, (c) functional oxygen and suction, (d) resuscitation and defibrillation (e) emergency lighting, (f) sterilization, and (g) emergency intercommunication.[71]

---

[68]*See* ACOG Standards at 65-66.

[69]*See* ACOG Standards at 68. The medical community has also concluded that abortions can be provided even later in ambulatory surgical facilities attached to hospitals because of the availability of surgical, recovery, and emergency response facilities.

[70]*See* ACOG Standards at 66.

[71]See ACOG Standards at 74.

The evidence concerning the adequacy of the facilities in Tennessee where outpatient abortions are performed is sketchy. Outside of the evidence with regard to the Planned Parenthood clinics in Memphis and Nashville, it is nonexistent. The Planned Parenthood clinics in Memphis and Nashville are licensed as ambulatory surgical treatment centers under Tenn. Code Ann. § 68-11-102(4)(A), but neither facility meets the ACOG Standards for performing post-fourteen week abortions.[72]

Because ambulatory surgical centers are of relatively recent vintage, the Planned Parenthood plaintiffs do not seriously argue that the General Assembly erred in 1973 when it decided that post-fourteen week abortions must be performed in hospitals. They argue instead that the hospitalization requirement has become outdated. Since it is no longer medically necessary to perform abortions through the eighteenth week of pregnancy in a hospital, they ascribe improper motives to the General Assembly for failing to update Tenn. Code Ann. § 39-15-201(c)(2) to make it consistent with current medical thinking.

Courts must be cautious about reading too much into legislative inaction. *See Johnson v. Transportation Agency*, 480 U.S. 616, 671-72, 107 S. Ct. 1442, 1472 (1987) (Scalia, J., dissenting); *Evans v. Steelman*, No. 01A01-9511-JV-00508, 1996 WL 557844 at *10 n.14 (Tenn. Ct. App. Oct. 2, 1996) (Koch, J., dissenting), *aff'd on other grounds*, ___ S.W.2d ___ (Tenn. 1998).[73] The record contains no indication that the General Assembly has declined or even has been requested to reconcile Tenn. Code Ann. § 39-15-201(c)(2) with the current ACOG Standards. Accordingly, we decline to read any sort of improper motive into the General Assembly's actions or inactions regarding the hospitalization requirement. Under the facts of this case, the arguments concerning updating the hospitalization requirement do not raise a constitutional issue but rather a policy issue that should be addressed to the General Assembly. Based on the evidence before us, we decline to find improper legislative motivation for the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2).

---

[72]As an illustration, one physician who performs abortions at the Planned Parenthood clinic in Nashville recounted an occasion when he was forced to complete a procedure using a flashlight when the clinic's electrical power failed.

[73]*See Evans v. Steelman*, No. 01S01-9701-JV-00019, 1998 WL 325224 (Tenn. Mar. 30, 1998).

The lack of evidence of improper legislative purpose does not end the inquiry. The hospitalization requirement must be invalidated if it has the effect of placing a substantial burden in the path of a woman seeking an abortion before fetal viability. The effect prong of the undue burden analysis requires us to focus on only those women for whom the requirement is actually a restriction. *See Planned Parenthood v. Casey*, 505 U.S. at 894, 112 S. Ct. at 2829. The group of women in Tennessee affected by the hospitalization requirement is quite limited.

Since 96% of all abortions performed in Tennessee are performed before or during the fourteenth week of pregnancy, the hospitalization requirement affects only 4% of the abortions performed in Tennessee. Of these abortions, the requirement does not impose an undue burden on women (a) who are more than eighteen weeks pregnant, (b) who elect to obtain their abortions outside of Tennessee for reasons of confidentiality or other similar reasons, and (c) whose medical condition otherwise requires hospitalization. While the evidence on these matters is sketchy, it appears that, at most, the hospitalization requirement could become a substantial obstacle for approximately 2% of the women seeking abortions in Tennessee - that is those women who are between fourteen and eighteen weeks pregnant who seek elective abortions and who, either by choice or necessity, decide to obtain their abortion in Tennessee.

The Planned Parenthood plaintiffs assert that the hospitalization requirement substantially burdens these women's procreational autonomy in three ways: (1) significantly increased cost, (2) additional delay and inconvenience, and (3) increased risk of complications. The fact that a regulation makes it more difficult or expensive for a woman to obtain an abortion is not enough to invalidate the regulation. *See Planned Parenthood v. Casey*, 505 U.S. at 874, 112 S. Ct. at 2819. Thus, inconvenience, even significant inconvenience, is not a substantial obstacle under the undue burden analysis. In order to constitute an undue burden, the regulation must be likely to prevent women from obtaining abortions. *See Karlin v. Foust*, 975 F. Supp. 1177, 1205 (W.D. Wis. 1997). Under the facts before us, we decline to find that the hospitalization requirement will likely prevent women desiring an elective abortion from obtaining one.

The record contains clear evidence that the average cost of abortions performed in hospitals is substantially higher than the cost of abortions performed in a physician's office or outpatient clinic.[74] Increased cost alone, however, is not an undue burden. Women can avoid these costs by obtaining their elective abortions during or prior to their fourteenth week of pregnancy. If they do so, they avoid the hospitalization requirement completely because they will be able to obtain the procedure at a physician's office or clinic.

The Planned Parenthood plaintiffs also argue that the hospitalization requirement imposes an undue burden because it increases inconvenience and causes delay. The record contains little probative evidence on this point. There is some evidence that women in Tennessee are presently traveling an average of fifty miles to obtain an elective abortion, and there is no evidence that they will be required to travel any further if they must obtain their elective abortion in a hospital. As with the cost issue, women can avoid this additional delay and inconvenience by obtaining their abortion during or before their fourteenth week of pregnancy.

In their final assault on the hospitalization requirement, the Planned Parenthood plaintiffs argue that hospitals may be less appropriate than physician's offices or outpatient clinics for performing abortions because (a) hospital staffs might be less supportive of women seeking elective abortions, (b) hospitals have a higher risk of nosocomial infection, and (c) hospitals present a greater risk for breaches of confidentiality. Again, the record contains little, if any, evidence to support these assertions other than the fears of the persons challenging the hospitalization requirement. The record before us does not contain sufficient evidence for us to conclude that hospital personnel will provide substandard care to women seeking elective abortions or that they will violate the strict confidentiality standards imposed on hospitals by state and federal law. Likewise, there is no objective evidence supporting the claim that women run a greater risk of nosocomial infection if they obtain an abortion in a hospital as opposed to a physician's office or outpatient clinic.

---

[74]This comparison is based on the cost of abortions performed during the first fourteen weeks of pregnancy. We have no similar comparison of costs for abortions performed after the first fourteen weeks because outpatient clinics are not presently performing these procedures. For the purpose of our analysis, we will presume that there are similar differences in the cost of post-fourteen week abortions. The cost difference is most likely not as great because the clinics would pass on to their patients most, if not all, of the increased operating expenses incurred to comply with the ACOG Standards.

In light of the present record, we find that the infection control standards imposed on hospitals by governmental regulations and accrediting agencies are sufficient to protect the health of women who are hospitalized when they obtain their abortions.

The American Medical Association has concluded that abortions are safest when they are performed early in a pregnancy by a well-trained physician working in a facility equipped to manage any complications that might arise.[75]  Because of the absence of evidence that the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2) has the purpose or effect of placing a substantial obstacle in the path of women seeking an elective abortion, we conclude that the hospitalization requirement does not place an undue burden on women's procreational autonomy.

## D.

The Planned Parenthood plaintiffs have also mounted a multifaceted attack on the informed consent requirements in Tenn. Code Ann. § 39-15-202(b), (c).  First, they take issue with the requirement in Tenn. Code Ann. § 39-15-202(b) that a woman be "orally informed [of the required information] by her attending physician."  Second, they assert that the information required to be provided by Tenn. Code Ann. § 39-15-202(b)(3), -202(b)(5), and -202(b)(6) and -202(c) is biased, inaccurate, and misleading[76] and that requiring that this information be provided unduly burdens women's procreational autonomy.  As with our consideration of the hospitalization requirement in Tenn. Code Ann. § 39-15-201(c)(2), we will construe the challenged provisions of Tenn. Code Ann. § 39-15-202(b), -202(c) as they were enacted by the General Assembly and as we construed them in Section III(C) of this opinion.

---

[75]American Medical Ass'n, Council on Scientific Affairs, "Induced Termination of Pregnancy Before and After Roe v. Wade: Trends in Mortality and Morbidity in Women," at 16 (May 1992).

[76]The State has not appealed from the trial court's decision that the information required by Tenn. Code Ann. § 39-15-202(b)(4) is misleading.  Accordingly, the validity of this provision is not before us.

# 1.

## TENN. CODE ANN. § 39-15-201(b)

We turn first to the requirement that physicians must personally provide their patients with the information required by Tenn. Code Ann. § 39-15-202(b), -202(c). Despite the United States Supreme Court's approval of this procedure, *see Mazurek v. Armstrong*, 520 U.S. 968, ___, 117 S. Ct. 1865, 1866 (1997); *Planned Parenthood v. Casey*, 505 U.S. at 883-885, 112 S. Ct. at 2824-25, the Planned Parenthood plaintiffs assert that it places an undue burden on procreational autonomy and that it infringes on a physician's freedoms of conscience and speech protected by Tenn. Const. art. I, § § 3 and 19. We will consider the physician's rights first.

The United States Supreme Court has recognized that similar requirements implicate a physician's First Amendment rights but has found that they are also part of a State's legitimate prerogative to regulate the practice of medicine. *See Planned Parenthood v. Casey*, 505 U.S. at 884, 112 S. Ct. at 2824. This reasoning is equally applicable to a physician's free speech rights protected by Tenn. Const. art. I, § 19. In some circumstances the protection afforded by Tenn. Const. art. I, § 19 may be broader than those of the First Amendment, *see Leech v. American Booksellers Ass'n, Inc.*, 582 S.W.2d 738, 745 (Tenn. 1979) (holding that the scope of Tenn. Const. art. I, § 19's protection of speech is at least as broad as that afforded by the First Amendment). However, the parties challenging Tenn. Code Ann. § 39-15-202(b) have failed to point out any difference in the wording of Tenn. Const. art. I, § 19 or in its history of construction that might support a broader construction in cases of this sort than the United States Supreme Court gave the First Amendment in *Planned Parenthood v. Casey*.

The connection between Tenn. Code Ann. § 39-15-202(b), (c) and a physician's freedom of conscience protected by Tenn. Const. art. I, § 3 is tenuous at best. The Constitution of Tennessee insulates from governmental control an individual's freedom to believe whatever he or she wishes, but it does not similarly insulate actions or conduct based on those beliefs. *See State ex rel. Swann v. Pack*, 527 S.W.2d 99, 111 (Tenn. 1975); *Harden v. State*, 188 Tenn. 17, 25, 216 S.W.2d 708, 711 (1948); *Wolf v. Sundquist*, 955 S.W.2d 626, 630-31 (Tenn. Ct. App. 1997). While states should tread lightly when imposing practice standards on licensed

professionals, they have the unquestioned authority under their police power to regulate the conduct of licensees. Requiring physicians to conform their conduct to prescribed standards does not thereby require physicians to alter their beliefs about the propriety or efficacy of abortions, nor does it require them to subscribe to ideas inconsistent with their own beliefs or standards. Accordingly, a requirement such as the one in Tenn. Code Ann. § 39-15-202(b) will not violate Tenn. Const. art. I, § 3, as long as it involves truthful, non-misleading information that is not likely to prevent women from obtain an abortion.

All parties agreed that women seeking an abortion should receive proper counseling before the procedure. They also agreed that this counseling should include appropriate information concerning the procedure itself and the possible risks and complications, as well as information necessary to enable the woman to understand the consequences of the procedure on herself and the fetus. The parties differed sharply over who should provide this information to the woman.

The opponents of Tenn. Code Ann. § 39-15-202(b) insist that the required counseling may be provided by persons other than the physician who will perform the procedure. In fact, they assert that trained counselors may provide more effective counseling than physicians because physicians do not receive training as counselors and may not be as empathetic listeners as counselors. They also point to the policy statements of both the American College of Obstetrics and Gynecology and the American Public Health Association that women may receive pre-abortion counseling from "trained, sympathetic individuals working under appropriate supervision"[77] and that physicians performing abortions "should verify that the counseling has taken place" if they do not perform the counseling themselves.[78]

On the other hand, the physicians supporting Tenn. Code Ann. § 39-15-202(b) insist that the physicians performing the procedure should personally provide their patients with the counseling and informed consent information. They assert that persons who are not medically trained should not be permitted to counsel with patients and that the physician who will actually perform the procedure is best suited

---

[77]American Pub. Health Ass'n, *APHA Recommended Program Guide for Abortion Services (Revised 1979)*, 70 Am. J. Pub. Health 652, 654 (1980).

[78]*See* ACOG Standards, at 68.

to explain the benefits and risks of the procedure and the alternative treatments. In support of their position, these physicians cite the Code of Ethics of the American Medical Association, which states that one of the fundamental elements of the relationship between a patient and a physician is that "[p]atients should receive guidance from the physicians as to the optimal course of action."[79]

The opposing views of physicians who testified in this case mirror the observation of Dr. Terrence Ackerman, the Chairman of the Department of Human Values and Ethics of the University of Tennessee College of Medicine. Citing the ACOG Standards,[80] Dr. Ackerman stated that physicians have an ethical obligation to obtain informed consent prior to surgery. He pointed out that the medical profession, as a general matter, assigns the role of obtaining proper informed consent to physicians and that physicians have a duty to determine whether they and their patients are in agreement with the proposed procedure. While Dr. Ackerman stated that the physician is the person who should obtain the informed consent, he did not rule out the possibility that circumstances could arise in which the physician could appropriately delegate this responsibility. He added, however, that delegation is not the accepted norm and that it should be permitted only when the treating physician receives an appropriate and relatively full report in order to assure himself or herself that the patient has been given the opportunity to make an autonomous decision.

The United States Supreme Court has upheld Pennsylvania's requirement that physicians, not their assistants, must provide their patients with the required information. *See Planned Parenthood v. Casey*, 505 U.S. at 884-85, 112 S. Ct. at 2824-25. With the medical opinions concerning the delegation of this responsibility

---

[79]Council on Ethical & Judicial Affairs, American Medical Ass'n, *Code of Medical Ethics, Court Opinions* xi (1992).

[80]The ACOG Standards state:

> In the event of an unwanted pregnancy, the physician should counsel the patient about her options: 1) continuing the pregnancy to term and keeping the infant, 2) continuing the pregnancy to term and offering the infant for legal adoption, or 3) aborting the pregnancy. When feasible, and with the patient's approval, the physician should offer this counseling to the patient's relatives and to her parents (if she is an adolescent) before this difficult decision is made. If the patient elects abortion, information about contraception should be offered. When the physician recommends pregnancy termination for medical or psychological indications, consultation may be appropriate.

ACOG Standards, at 62.

so evenly divided, we are not prepared to hold that the General Assembly established this requirement to interfere with a woman's procreational autonomy.

The Planned Parenthood plaintiffs also argue that the physician counseling requirement will have the effect of unduly burdening a woman's procreational choice because it will force physicians to spend more time with each patient thereby reducing the time available to them to perform abortions. They view this as a substantial obstacle because of the limited number of physicians who are willing to perform abortions. However, the evidence does not provide a direct causal link between the Planned Parenthood clinics' recruiting difficulties and Tenn. Code Ann. §§ 39-15-201, -202. To the contrary, the evidence indicates that the shortage of physicians willing to perform abortions is caused by (a) the decrease in the number of medical schools providing training in the procedure, (b) physicians' personal decisions not to perform abortions, (c) physicians' reluctance to take time away from their regular practice, and (d) physicians' concern about their relationship with both their regular patients and their peers.

Enforcing the physician counseling requirement will require physicians providing abortions in a Planned Parenthood clinic to spend more time with their patients. Clinic representatives testified that physicians at their facilities spend, on average, only ten minutes with each patient, including the two to five minutes required to perform the procedure itself. By contrast, other physicians testified that they spend from fifteen to thirty minutes counseling their patients before performing the procedure. In recognition of the importance of proper pre-abortion counseling and the profound significance of the woman's decision, we decline to find, on these facts, that the requirement in Tenn. Code Ann. § 39-15-202(b) that physicians personally provide the counseling to their patients places a substantial obstacle in the path of a woman seeking an elective abortion.

## 2.
### TENN. CODE ANN. § 39-15-202(b) & (c)

The Planned Parenthood plaintiffs also take issue with the substance of several of the statutory informed consent requirements. They argue that mandatory informed

consent unduly burdens procreational choice because (a) it is biased in favor of continuing pregnancies to term, (b) it creates unnecessary stress because most women have already decided to have an abortion by the time they contact Planned Parenthood, and (c) providing this information in cases where the abortion is therapeutic rather than elective is inappropriate and cruel.

We need not tarry long with the bias claim. The United States Supreme Court has already rejected this argument when it held that States could constitutionally adopt measures designed to persuade women to choose childbirth over abortion. *See Planned Parenthood v. Casey*, 505 U.S. at, 877-78 112 S. Ct. at 2821. Decisions concerning whether to have an abortion have profound and lasting meaning. Accordingly, the State may take steps to ensure that a woman's decision is thoughtful and informed and

> may erect rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing her pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself.

*Planned Parenthood v. Casey*, 505 U.S. at 872, 112 S. Ct. at 2818.

The claim that state-mandated counseling increases stress for women who have already decided to have an abortion is equally without merit because the State has a significant interest in making sure that a woman's decision to have an abortion is autonomous, informed, and well-considered. The Planned Parenthood plaintiffs assert that virtually all women have already decided to obtain an abortion before they contact one of their clinics. However, they also concede that only 43% of their patients are referred to them by a private physician. Thus, it is reasonable to conclude that approximately one-half of Planned Parenthood's patients have made their decision to have an abortion without appropriate medical counseling or advice.

The State has a legitimate interest in establishing a framework to ensure that a woman's consideration of her options is commensurate with the importance of her decision. Thus, as Dr. Ackerman stated, the fact that a woman might have made up her mind to have an abortion is irrelevant insofar as proper counseling and informed consent are concerned. The State may take steps to see to it that a woman makes an

informed, autonomous choice and that she understands not only the nature and the risks of the procedure but also the other alternatives available to her.

The final challenge to the mandatory counseling is that it is cruel and unnecessary to provide this information to women who must undergo therapeutic abortions to protect their health or life. Requiring women facing a medically necessary abortion to participate in the mandatory counseling required by Tenn. Code Ann. § 39-15-202(b) & (c) is undoubtedly inappropriate. However, this argument overlooks the mandatory constitutional requirement that regulations such as Tenn. Code Ann. § 39-15-202(b) & (c) must be subject to an emergency medical exception that will enable physicians to bypass any or all of these counseling requirements when medically necessary. *See Planned Parenthood v. Casey*, 505 U.S. at 880, 112 S. Ct. at 2822. Tenn. Code Ann. § 39-15-202(h) currently contains such an emergency medical exception, even though it is constitutionally deficient in its current form because it fails to include circumstances and conditions that seriously endanger a woman's health. However, once brought into compliance with constitutional standards, this provision will obviate the mandatory counseling requirement when women require a therapeutic abortion.

### 3.
### TENN. CODE ANN. § 39-15-202(b)(3)

In their first of three challenges to specific statutorily required information, the Planned Parenthood plaintiffs take issue with Tenn. Code Ann. § 39-15-202(b)(3) that requires physicians to inform their patients

> That if more than twenty-four (24) weeks have elapsed from the time of conception, her child may be viable, that is, capable of surviving outside the womb, and that if such child is prematurely born alive in the course of the abortion, her attending physician has a legal obligation to take steps to preserve the life and health of the child.

While they do not take issue with the truthfulness of this information, they assert that it is irrelevant to the vast majority of women seeking an abortion because these women obtain their abortions long before the twenty-fourth week of pregnancy. On the assumption that providing truthful yet irrelevant information can unduly burden

procreational autonomy,[81] we find that the information mandated by Tenn. Code Ann. § 39-15-202(b)(3) is relevant to all women considering whether to have an elective abortion.

Ninety percent of the abortions performed in Tennessee are performed during the first twelve weeks of pregnancy. However, the Planned Parenthood plaintiffs presented evidence that younger women tend to put off making their decision and thus generally obtain abortions later in their pregnancy. Even though the physicians differed about the relevance of this information, they did not disagree that abortions become more risky as a pregnancy advances and that elective abortions cannot be performed once a fetus becomes viable.

As we interpret the information required in Tenn. Code Ann. § 39-15-202(b)(3), it is intended to impress on a woman the consequences of waiting too long before deciding to obtain an abortion. The information is quite relevant to all women seeking elective abortions because it assists them in making informed, autonomous decisions. Accordingly, like the trial court, we find that providing women with the information required by Tenn. Code Ann. § 39-15-202(b)(3) does not unduly burden their procreational choice.

## 4.
### TENN. CODE ANN. § 39-15-202(b)(5)

The Planned Parenthood plaintiffs also take issue with Tenn. Code Ann. § 39-15-202(b)(5) that requires physicians to inform their patients

> That numerous public and private agencies and services are available to assist her during her pregnancy and after the birth of her child, if she chooses not to have an abortion, whether she wishes to keep the child or place him [or her] for adoption, and that her physician will provide her with a list of such agencies and services available if she so requests.

Earlier in Section III(C)(2) of this opinion, we held that this statute does not require physicians to know about every public and private organization that could possibly help a pregnant woman with either medical care or adoption services. Rather, we

---

[81]We need not decide in this case whether providing truthful yet irrelevant information places an undue burden on procreational choice because the parties have neither raised nor briefed the issue.

construed the statute to require physicians to provide their patients with information reasonably known to them.

Even though the United States Supreme Court has explicitly approved providing women with this sort of information, *see Planned Parenthood v. Casey*, 505 U.S. at 872, S. Ct. at 2818, the Planned Parenthood plaintiffs insist that it is inaccurate and misleading because the public and private agencies in Tennessee that provide medical services, financial support, and adoption services are neither numerous nor reasonably available to most women. They also insist that providing this information to women requiring therapeutic abortions would be cruel and traumatizing, especially if the fetus has profound abnormalities or if the pregnancy was the result of rape or incest.

In order to determine whether providing women with the information required by Tenn. Code Ann. § 39-15-202(b)(5) burdens procreational choice, we must first identify the class of women to which this provision is relevant. It is not relevant to women who have the financial means to obtain adequate medical care for themselves and their child. It is likewise not relevant to women who qualify under the emergency medical exception in Tenn. Code Ann. § 39-15-202(h). Thus, this provision is most relevant to low income women seeking elective abortions. We must decide whether this information is inaccurate and whether it will most likely have the effect of preventing these women from obtaining elective abortions.

The parties challenging the accuracy of the information required by Tenn. Code Ann. § 39-15-202(b)(5) point to the October 1992 final report of the Committee to Study Aid To Families With Dependent Children as proof that Tennessee does not have numerous public and private agencies that provide medical and adoption services to financially disadvantaged pregnant women and new mothers. This report demonstrates in convincing terms that Tennessee's poorest families must struggle for many of life's basic necessities and that the State's AFDC program falls short of meeting these basic needs. It does not, however, support the Planned Parenthood plaintiffs' arguments in this case for two reasons. First, the fact that gaps in AFDC coverage exist does not necessarily mean that there are not many public and private agencies in Tennessee providing medical and adoption services to women seeking

them.  Second, the report does not reflect the improvements in the availability of medical care brought about by the TennCare program.

The opponents of Tenn. Code Ann. § 39-15-202(b)(5) point to the finding in the AFDC report that thirty-five of Tennessee's ninety-five counties have no obstetrician willing to accept Medicaid.[82]  While this may very well be true, the Director of Women's Health of the Tennessee Department of Health testified that all county health departments provide basic prenatal services with no eligibility requirements. She also stated that comprehensive prenatal care is available in twenty-five counties and that the Department has contracted with private physicians for similar services in other areas.  Women residing in counties where no prenatal care is available may obtain the care in other counties, and according to the Director, it is quite common for women to gravitate toward service areas where specialty care is available.

The implementation of the TennCare program has also improved the availability of prenatal care and medical care for young children.  As a result of TennCare, tens of thousands of children who did not have healthcare coverage in the past are now insured.[83]  In addition,

> 242,264 girls and women ages 14 to 44 - roughly childbearing age - are now covered and have greater access to prenatal care.
> Many of those now covered by TennCare, but who were not covered by Medicaid, are lower-income working people who previously had to self-ration health care because of their limited financial resources.  This could have lead [sic] to a pregnant woman having little prenatal care or preventative medical care for the family.

*Kids Count*, at 10.  As a result, Tennessee's prenatal care indicator has improved from 1990 when 32.3% of all births lacked adequate prenatal care to 1995 when 27.3% of births lacked adequate prenatal care.  *See Kids Count*, at 11.  This improvement should continue as a result of another TennCare initiative beginning in April 1997 enabling uninsured children under 18 years of age to apply for TennCare coverage. *See Kids Count*, at 11.

---

[82]Report of Committee to Study Aid to Families with Dependent Children, at p. 7 (Oct. 1992).

[83]*See* Tennessee Comm'n on Children & Youth, *Kids Count, The State of the Child in Tennessee 1996*, at 10 (May 1997) ("*Kids Count*").

In addition to the public services available to pregnant women, the record contains evidence of a number of private and not-for-profit service providers. The physicians testifying concerning the availability of services in Nashville identified four agencies providing these services. One physician observed that two of these agencies have never failed to provide assistance to patients he has referred to them. Planned Parenthood of Nashville's own clinical policies and procedures manual contains numerous references to both public and private providers who offer basic medical care, obstetric and gynecologic care, and adoption services.

The Planned Parenthood personnel who testified at trial stated that they collect this referral information because they believe that part of the informed consent process is making sure that a woman is informed of her alternatives and because they desire to provide comprehensive services to their patients. Thus, for women who decide to continue their pregnancy to term, the Planned Parenthood of Nashville manual stresses that women who are concerned about monetary needs should be provided "referrals for subsidized food programs, prenatal care, or even housing and Medicaid referrals." For a woman considering adoption, the manual directs that she be given "counseling and adoption referrals." The manual also recommends that a woman considering adoption should be informed that "some couples might reimburse her for the medical and food bills" and that she should be provided assistance in seeking "support systems such as parents, relatives, and her church."

Those testifying both in favor of and in opposition to Tenn. Code Ann. § 39-15-202(b)(5) agreed that pregnant women considering elective abortions should be counseled concerning their alternatives. This particular section reflects this consensus. It does not require physicians to provide their patients with every possible public or private agency that might help them. Of equal importance, it does not require physicians to inform their patients that deciding to continue their pregnancy to term will be easy or without risk. Nor does it require physicians to leave their patients with the erroneous impression that the care and services that they and their babies will require are convenient or readily available simply for the asking. All that Tenn. Code Ann. § 39-15-202(b)(5) requires physicians to do is to provide their patients, if requested, with truthful, accurate information concerning public and private agencies that might be able to provide them with assistance should they decided to carry their pregnancy to term. While several physicians viewed this

requirement as inconvenient, it does not place an undue burden on a woman's procreational choice.

# 5.
## TENN. CODE ANN. § 39-15-202(b)(6) & -202(c)

The final challenged informed consent provisions require that women considering an abortion should be told that

> Numerous benefits and risks are attendant either to continued pregnancy and childbirth or to abortion depending upon the circumstances in which the patient might find herself. The physician shall explain these benefits and risks to the best of his [or her] ability and knowledge of the circumstances involved.

Tenn. Code Ann. § 39-15-202(b)(6) and that

> At the same time the attending physician provides the information required by subsection (b), he [or she] shall inform the pregnant woman of the particular risks associated with her pregnancy and childbirth and the abortion or child delivery technique to be employed, including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion or childbirth in order to ensure her safe recovery.

Tenn. Code Ann. § 39-15-202(c). The Planned Parenthood plaintiffs take issue with these provisions because (a) it is not clear what additional information Tenn. Code Ann. § 39-15-202(c) requires that is not already required by Tenn. Code Ann. § 39-15-202(b)(6), (b) physicians are not able to predict at the early stages of a pregnancy which childbirth technique might eventually be employed, (c) the information concerning delivery techniques and postpartum care is irrelevant to women seeking an abortion, and (d) it is impossible to know in advance what specific benefits a woman will derive from carrying her pregnancy to term.

Tenn. Code Ann. § 39-15-202(b)(6) & -202(c) are not models of clear legislative drafting. In this circumstance, our task is to make sense rather than nonsense out of their terms. *See McCellan v. Board of Regents*, 921 S.W.2d at 689. We must discover and give the fullest possible effect to the General Assembly's purpose, *see Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997), without unduly restricting the statute or expanding it beyond its intended scope. *See Hicks*

*v. State*, 945 S.W.2d at 707; *Riggs v. Burson*, 941 S.W.2d at 54. In doing so, we must ascribe the words in the statute their natural and ordinary meaning, *see Davis v. Reagan*, 951 S.W.2d 766, 768 (Tenn. 1997), and we must also consider the words in the context of the entire statute. *See Kultura, Inc. v. Southern Leasing Corp.*, 923 S.W.2d 536, 539 (Tenn. 1996).

These two provisions overlap significantly. When read together in light of the General Assembly's purpose to ensure that women make fully informed, autonomous decisions about whether to obtain an abortion, we find that they require physicians to provide their patients the following information:

(1)  that there are numerous risks and benefits attendant to having an abortion or carrying a pregnancy to term;

(2)  the specific risks associated with either abortion or childbirth that the particular patient herself might face in light of the physician's reasonable understanding and knowledge of the patient's condition;

(3)  a general discussion of the risks and benefits of both childbirth and abortion; and

(4)  a general explanation of the expected course of a routine pregnancy without complications and the expected recovery from both a routine delivery and a routine abortion.

This information is relevant to women faced with a choice between having an abortion and carrying the pregnancy to term. It enables them to make an informed, autonomous decision.

Tenn. Code Ann. § 39-15-202(b)(6) & -202(c) do not require physicians to describe the specific benefits that each particular patient might gain from carrying her pregnancy to term or by deciding to have an abortion. Physicians will satisfy these requirements by explaining in general terms how abortions may benefit women by permitting them to continue with their lives without being required to deal with an unwanted pregnancy. Likewise, it will be sufficient for physicians to explain to their patients in general terms the benefits of carrying their pregnancy to term. For women who decide to keep their child, these benefits may include the joys of parenthood. For women who decide to give up their child for adoption, the benefits may include knowing that they have enabled another couple to enjoy parenthood and that their child will be provided for.

Finally, we turn to the Planned Parenthood plaintiffs' assertion that Tenn. Code Ann. § 39-15-202(c) requires physicians to inform their patients of the specific delivery technique that will be used if they decide to carry their pregnancy to term. They point out that it is difficult to predict early in a pregnancy which delivery technique will be used, especially if the prediction is being made by a physician who will not deliver the child. Thus, they assert that requiring this information prompts conjecture that could very well prove to be wrong depending on the course of a woman's pregnancy.

We would agree with the Planned Parenthood plaintiffs' concerns if Tenn. Code Ann. § 39-15-202(c) required physicians to guess which delivery technique will be used for a particular patient. However, we do not construe the statute to require this information. In the context of the entire provision, the statutory terms at issue require physicians to inform their patients of "the particular risks associated with . . . the . . . child delivery technique to be employed . . ." Reasonably understood, this language requires only that physicians provide their patients with a general description of the risks associated with commonly employed child delivery techniques. This information is certainly relevant to pregnant women who are considering whether to have an abortion or to carry their pregnancy to term, and physicians, even ones who do not expect to deliver the child, are certainly capable of providing it.

While the evidence demonstrates that physicians are unable to guess in the early weeks of a woman's pregnancy which delivery technique will be used, the same cannot be said for abortion techniques. The evidence contains overwhelming proof that physicians know which abortion procedure they will employ if their patient decides to have an abortion during the first fourteen weeks of pregnancy.[84] In addition, the basic requirements of informed consent require physicians to provide their patients with specific information concerning the risks attendant to the procedure they propose to perform. Thus, the requirement in Tenn. Code Ann. § 39-15-202(c) that physicians inform their patients of "the particular risks associated with

---

[84]Over 97% of the abortions performed in Tennessee employ the suction curettage procedure. *See* Division of Information Resources, Tennessee Dep't of Health, *Report of Induced Abortions in Tennessee 1990*, at 15 (Jan. 1992).

. . . the abortion . . . technique to be employed" places no more burden on physicians than the law presently imposes.

## 6.
### TENN. CODE ANN. § 39-15-202(d)

The mandatory waiting period is the final challenged feature of the informed consent process. Tenn. Code Ann. § 39-15-202(d)(1) requires that

> There shall be a two (2) day waiting period after the physician provides the required information, excluding the day on which such information was given. On the third day following the day such information was given, the patient may return to the physician and sign a consent form.

Tenn. Code Ann. § 39-15-202(d)(3) contains an emergency medical exception specifically applicable to Tenn. Code Ann. § 39-15-202(d)(1) that permits foregoing the waiting period when delaying the procedure could endanger the life of the mother.[85] The trial court determined that any inflexible waiting period unduly burdened a woman's right to terminate her pregnancy under both the federal and state constitutions. The trial court's decision, to the extent it rests on the effect of the waiting period on the physician-patient relationship, is inconsistent with *Planned Parenthood v. Casey*. It also devalues the State's legitimate interest in maternal health and the State's constitutionally-recognized prerogative to establish a decision-making framework to ensure that a woman's decision is considered and autonomous.

Deciding whether to have an abortion is one of the most difficult choices that a woman can make. There is no psychologically painless way to make this decision, and in fact, most women perceive it as a choice of the lesser of two unfortunate options. All parties agree that a woman in this predicament should make a deliberate, informed choice. They do not agree, however, on whether a mandatory waiting period should be part of the decision-making process.

---

[85]This emergency medical exception is similar to the general emergency medical exception found in Tenn. Code Ann. § 39-15-202(h). We need not address in this case whether having two potentially overlapping emergency medical exceptions introduces unconstitutional ambiguity into the statute. However, as we concluded in Section V(F) of this opinion, the scope of this exception, like that of Tenn. Code Ann. § 39-15-202(h), is too narrow.

The opponents of statutorily mandated informed consent procedures insist that decisions concerning an abortion are not easily made and are not easily changed once made. They assert that statutory waiting periods are unnecessary because a vast majority of women have already decided to have an abortion by the time they consult an abortion provider. In addition, they argue that women do not favor waiting periods and that requiring a woman to wait for any pre-ordained amount of time increases her anxiety and stress and adds to the inconvenience and cost of the procedure. They also express concern that delay could cause medical complications and could even push a woman past the time when she will be able to obtain an abortion in her physician's office or in an outpatient clinic.

The advocates of a waiting period respond that a woman's interests are not well served by making a snap decision about an abortion and that a waiting period actually helps women to regain a sense of control and to increase their self-esteem. They point out that unwanted pregnancies cause highly stressful situations which promote reactive thinking and that the waiting period prompts women to discuss their pregnancy with the other important persons in their lives and to reflect on their choice. They also point out that a waiting period does not generally entail a health risk and that any delay caused by a waiting period is not disproportionate to delays normally attendant to other kinds of elective surgery.

There is a consensus among the medical community that a woman "should be allowed sufficient time for reflection before she makes an informed decision" concerning an abortion. *See* ACOG Standards, at 68. Some physicians assert that counseling and informed consent "may be best performed a day or so preceding the operation to ensure that the patient is emotionally committed to undergoing the abortion." Warren C. Plauché, et al., *Surgical Obstetrics* 122 (1992). In the final analysis, all testifying physicians agreed that the attending physician should perform an abortion only when satisfied that the patient has made an informed, autonomous choice.

The trial court acknowledged the need for a "sufficient time for reflection," but determined that deciding how much time is sufficient was a matter to be decided solely by the woman and her physician, not the General Assembly. The trial court concluded that "a sufficient amount of time varies with each individual woman, and

the inflexibility of a two-day waiting period as it applies to every woman except in a medical emergency situation requires its invalidation." Accordingly, the trial court found that the waiting period in Tenn. Code Ann. § 39-15-202(d) infringed upon a woman's "flexible patient-physician autonomous relationship" and that this relationship was an integral part of the right of procreational autonomy protected by the Constitution of Tennessee.

We turn first to the trial court's conclusion that the waiting period in Tenn. Code Ann. § 39-15-202(d)(1) is unconstitutional simply because it is at least twice as long as the waiting period upheld in *Planned Parenthood v. Casey*. We have discovered no precedent for the notion that a waiting period's constitutionality somehow hinges on its length alone. While a waiting period's length has some bearing on whether it unconstitutionally burdens procreative choice, it is not evidence, in and of itself, that the General Assembly intended to place a substantial obstacle in the path of women seeking an abortion. Accordingly, the trial court erred by holding that the length of the waiting period alone renders the statute unconstitutional.

Likewise, the trial court erred by holding that the waiting period is unconstitutional because it interferes with the physician-patient relationship. The United States Supreme Court rejected a similar argument in *Planned Parenthood v. Casey* when it upheld Pennsylvania's waiting period even though it interfered with the physician's discretion. *See Planned Parenthood v. Casey*, 505 U.S. at 886, 112 S. Ct. at 2825. In doing so, the Court held that waiting periods enhance the informed consent process as long as they do not create an appreciable health risk and do not place a substantial obstacle in the path of women seeking an abortion. *See Planned Parenthood v. Casey*, 505 U.S. at 885-86, 112 S. Ct. at 2825.

A waiting period may still be found unconstitutional under the state and federal constitutions if it cannot withstand scrutiny under the effects prong of *Planned Parenthood v. Casey's* undue burden test. Using this test, an abortion regulation should be found unconstitutional if it will likely prevent a significant number of women for whom the restriction is relevant from obtaining an abortion. *See Planned Parenthood v. Casey*, 505 U.S. at 894-95, 112 S. Ct. at 2829-30. Waiting periods are relevant to women seeking an abortion of a nonviable fetus who do not meet the

requirements for an emergency medical exception under either Tenn. Code Ann. § 39-15-202(d)(3) or Tenn. Code Ann. § 39-15-202(h). An analysis under the effects prong on the undue burden standard is fact-intensive. Accordingly, we return to the record to analyze the evidence concerning the effect that the waiting period in Tenn. Code Ann. § 39-15-202(d)(1) has had or will have on procreational choice. The record contains some evidence concerning the operation of Tennessee's mandatory waiting period, although this evidence is relatively old and geographically limited.

In the context of the federal litigation challenging Tennessee's residency requirement and mandatory waiting period, Memphis Planned Parenthood commissioned two studies concerning the attitudes of women seeking elective abortions to the waiting period now found in Tenn. Code Ann. § 39-15-202(d).[86] While 77% of the women surveyed said that they gained no benefit from the waiting period, 23% identified benefits such as (a) providing more time to consider the decision, (b) providing additional time to adjust psychologically, and (c) providing additional time to learn about the medical aspects of the procedure. *See* Lupfer & Silber, at 76. In addition, 41% of the women stated that the waiting period was not burdensome while 59% percent identified problems such as (a) additional stress, (b) additional nausea, (3) additional expense for travel and childcare, (d) missing work and school, and (e) requiring them to make up additional excuses. *See* Lupfer & Silber, at 76-77. The women also reported an increase in their expenses of approximately $24. *See* Lupfer & Silber, at 75.

These surveys also shed some light into the women's decision-making process. Of the women surveyed, 59% stated that they decided to obtain an abortion within twenty-four hours of learning that they were pregnant. *See* Lupfer & Silber, at 76.[87] While 88% of the women stated that they talked about their pregnancy to someone else before seeing a counselor at a Planned Parenthood clinic, only 7% of the women had discussed their pregnancy with a physician or a nurse. *See* Lupfer & Silber, at

---

[86]The first of the two studies involved women seeking abortions from Planned Parenthood clinics in Knoxville and Memphis between October 1979 and January 1980. The second study involved women in Memphis but excluded women who expressed an uncertainty about obtaining an abortion. See Michael Lupfer & Bohne G. Silber, *How Patients View Mandatory Waiting Periods for Abortions, 13 Fam. Planning Perspectives* 75, 76 (March/April 1981) ("Lupfer & Silber"). The State has not challenged the methodology of these studies, and we express no independent opinion concerning the studies' methodology or conclusions.

[87]The record contains other evidence that women decide whether they will obtain an abortion within one week after missing their menstrual period.

76. Most often, the women had discussed their pregnancy with their partner or with a close friend. Only 17% had talked with their mothers, and only 2% had talked with a counselor or minister. The women surveyed stated that they obtained the abortion within fourteen to twenty-one days after making their decision.

In July 1978, the United States District Court for the Western District of Tennessee temporarily enjoined the enforcement of the waiting period. *See Planned Parenthood of Memphis v. Blanton*, No. 78-2310 (W.D. Tenn. Jul. 14, 1978). In March 1981, following an evidentiary hearing that included the introduction of the two Planned Parenthood studies, the United States District Court "with considerable trepidation under these circumstances" permanently enjoined the enforcement of the waiting period. *See Planned Parenthood of Memphis v. Alexander*, No. 78-2310 (W.D. Tenn. Mar. 23, 1981). In doing so, the court noted that it was "not persuaded that there has been an 'undue burden' cast by the requirement of a waiting period" but that it was constrained to grant the injunction because of "the almost universal holding of courts of appeal . . . setting aside the waiting period (even a 24-hour period)." *Planned Parenthood of Memphis v. Alexander*, *supra*, at 17.

As a result of the injunction that has been in place since 1981, the record in this case contains no current data concerning Tennessee's waiting period. There is little other reliable evidence on this issue.[88] Prior to 1991, the Planned Parenthood clinics in Memphis and Nashville provided only one-day abortion services in which the counseling and the procedure took place on the same day. Sometime in early 1991, both clinics began to offer two-step procedures in which the counseling and necessary medical tests are performed on one day and then the patient returns on another day for the procedure. While the two-step procedure was offered for the patient's convenience, the Memphis clinic discontinued it after several weeks because of lack of demand. The Nashville clinic continues to offer the two-step procedure, and it is now requested by 59% of the clinic's patients. Prior to offering the two-step procedure, approximately 30% of the Nashville clinic's patients and 40% of the

---

[88]At one point late in the proceeding, the trial court referred to but did not appear to rely on data obtained by The Alan Guttmacher Institute that was introduced through its Deputy Director of Research. Other courts, citing what they believed to be serious methodological shortcomings, have declined to give credence to other Institute studies. *See Karlin v. Foust*, 975 F. Supp. at 1215-18 (declining to accredit the deputy director's conclusion that Wisconsin's 24-hour waiting period operates as a substantial obstacle in a large number of cases).

Memphis clinic's did not keep their appointment for the one-day procedure.[89]  In contrast, of the women who opt for the two-step procedure at the Nashville clinic, only 7% do not return for their second appointment when the procedure is performed.

Much of the force of the argument that any sort of waiting period will prevent a significant number of women from obtaining an abortion is undermined by the Planned Parenthood plaintiffs' own evidence.  Forty-one percent of the women surveyed in 1979 and 1980 did not perceive that the waiting period burdened their decision to obtain an abortion.  The difficulties identified by the remaining women are virtually the same problems that the United States Supreme Court has declined to classify as substantial burdens.  *See Planned Parenthood v. Casey*, 505 U.S. at 885-87, 112 S. Ct. at 2825-26 (holding that requiring two visits to the physician and the accompanying costs and delay did not unduly burden a woman's decision to obtain an abortion).  Similarly, the evidence that 59% of the Nashville clinic's patients voluntarily opt for the two-step procedure indicates that a majority of the women currently seeking an abortion do not view a delay between their initial and second appointment as a substantial obstacle.  The record contains no evidence that a very large number of Tennessee women have been or are being subjected to additional harassment or that they have had their confidentiality breached by choosing the two-step procedure.[90]  Likewise, the record contains no evidence that a large number of women either in 1979, 1980, or at the present time, have experienced significant health problems or have been forced to forego obtaining an abortion in an outpatient clinic or physician's office solely because of the delay between their first and second clinic appointments. Taken in its entirety, the evidence fails to demonstrate that women in Tennessee are being or will be burdened anymore by a waiting period than were the women in Pennsylvania whose waiting period was upheld by the United States Supreme Court.

Given the importance of the decision, there is virtual unanimity among the witnesses that a woman's choice should be informed and autonomous.  In order for a decision to be truly informed, a women should understand the nature of the

---

[89]The clinics' records do not indicate how many of the women who missed their first appointment obtained another appointment and eventually obtained an abortion.

[90]The medical director of the Planned Parenthood clinic in Nashville could not recall any incidents of harassment or of breach of confidentiality.  The clinic's clinical director recalled only one incident where the privacy of a woman choosing the two-step procedure was breached.

procedure, the risks associated with the procedure and with pregnancy, the costs of the options available to her, the alternatives to abortion, and the effects of the decision on her unique personal circumstances. After receiving this information, she should also be allowed sufficient time for reflection in order to make sure that she understands the decision and is comfortable with her choice, whatever it might be. In contrast to the lack of evidence concerning the burdensome effects of a waiting period, the record contains evidence that a statutorily mandated informed consent process that includes a waiting period promotes deliberate, autonomous decisions concerning the termination of a pregnancy.

The evidence indicates that women in Tennessee are quick to make up their minds about having an abortion. Sometimes they make a decision when they only suspect they might be pregnant, but most often they make their decision shortly after their pregnancy is confirmed. According to the Planned Parenthood plaintiffs' evidence, few women have consulted a medical professional of any sort when they first make their decision. Most of the women who have shared the fact that they are pregnant with anyone have shared it with their partner or a close friend. Thus, many women appear not to have received the very information that only health professionals can provide about abortion when they make their initial decision.

In light of this evidence, health professionals have insufficient basis to assume that most women seeking abortions have already been fully and appropriately counseled when they first come to a clinic to obtain an abortion. It thus becomes the physician's responsibility to see to it that his or her patient makes an informed and autonomous choice that best accommodates her personal circumstances. The informed consent requirements in Tenn. Code Ann. § 39-15-202(b), -202(c) and the waiting period in Tenn. Code Ann. § 39-15-202(d) represent an appropriate legislative effort to establish a decision-making framework that reflects a profound respect for the potential life of the unborn, ensures that each woman's choice is informed and autonomous, and does not unduly burden a woman's ability to obtain an abortion once she has made up her mind to obtain one.

As a final matter, the duration of the waiting period requires some comment. The waiting period in Tenn. Code Ann. § 39-15-202(d) is at least twice as long as the 24-hour waiting period approved in *Planned Parenthood v. Casey*. While the length

of the waiting period gives us some concern, we are reluctant to hold that the constitutionality of a waiting period depends solely on its length. We have been unable to find any case, either before or after the *Planned Parenthood v. Casey* decision, upholding a waiting period longer than twenty-four hours.[91] But the lack of precedent supporting a 48-hour waiting period does not preclude us from upholding such a waiting period. Under *Planned Parenthood v. Casey*, we should not disturb the General Assembly's decision to establish this requirement unless it has the practical effect of preventing a significant number of women from obtaining an abortion.

The Planned Parenthood plaintiffs' strategy in this litigation was to place the burden on the State to prove that the challenged provisions in Tennessee's abortion statutes serve a compelling governmental interest and are precisely tailored to further that interest alone. They anticipated that this court would find a broader right of procreational privacy in the Constitution of Tennessee than is found in the United States Constitution. The evidence they presented at trial reflected this strategy, and it was only after the trial court indicated that it would not employ *Roe v. Wade*'s strict scrutiny standard that the plaintiffs asserted that their proof was sufficient to carry their burden of proving that the challenged provisions unduly burdened women's procreational autonomy. While the plaintiffs introduced some evidence of the burdens and inconveniences that a waiting period could cause women seeking an abortion, they have failed to prove that waiting periods, as a general matter, place an undue burden on procreational choice.

In their assault on waiting periods in general, the Planned Parenthood plaintiffs presented little, if any, proof concerning how the 48-hour waiting period in Tenn. Code Ann. § 39-15-202(d) placed a greater burden on women seeking an abortion than the 24-hour waiting period upheld in *Planned Parenthood v. Casey*. In fact, several of their witnesses testified that a 24-hour waiting period would essentially cause the same burden to women seeking an abortion as the waiting period in Tenn. Code Ann. § 39-15-202(d). Accordingly, based on the evidence in this record, we

---

[91]We have found no decisions handed down since *Planned Parenthood v. Casey* construing the constitutionality of a waiting period longer than twenty-four hours. Prior to 1992, at least four courts struck down 48-hour waiting periods. *See Womens Servs., P.C. v. Thone*, 636 F.2d 206, 210 (8th Cir. 1980); *Wynn v. Carey*, 599 F.2d 193, 196 (7th Cir. 1979); *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 483 F. Supp. 679, 696 (W.D. Mo. 1980); *Women's Community Health Ctr., Inc. v. Cohen*, 477 F. Supp. 542, 551 (D. Me. 1979).

have no factual basis for concluding that the waiting period in Tenn. Code Ann. § 39-15-202(d) unduly burdens a woman's procreational autonomy. This is the same factual conclusion reached by the United States District Court in 1981. Of course, our conclusion based on the facts in this record does not prevent another court from reaching a different conclusion in another case based on different evidence.

E.

The Planned Parenthood plaintiffs have also challenged the parental notification procedures in Tenn. Code Ann. § 39-15-202(f). The trial court invalidated these procedures in its initial ruling, but before the trial court entered a final order, the General Assembly repealed the parental notification procedures in Tenn. Code Ann. § 39-15-202(f) and replaced them with the parental consent procedures in Tenn. Code Ann. §§ 37-10-301, -307. The parties properly informed the trial court of this development, but no party sought to amend its pleadings to raise the issue of the constitutionality of the parental consent procedures in these proceedings. Nonetheless, the trial court, on its own initiative, declared that the parental consent procedures were constitutional without first giving the parties the opportunity to present evidence or legal arguments concerning this provision.

The doctrine of justiciability prompts the courts to stay their hand in cases that do not involve a genuine, existing controversy. *See State ex rel. Lewis v. State*, 208 Tenn. 534, 537, 347 S.W.2d 47, 48 (1961); *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). Courts should decline to render advisory opinions, *see Super Flea Market of Chattanooga, Inc. v. Olsen*, 677 S.W.2d 449, 451 (Tenn. 1984); *Parks v. Alexander*, 608 S.W.2d 881, 892 (Tenn. Ct. App. 1980), or to decide abstract legal questions. *See State ex rel. Lewis v. State*, 208 Tenn. at 538, 347 S.W.2d at 48-49; *Eyring v. East Tenn. Baptist Hosp.*, 950 S.W.2d 354, 359 (Tenn. Ct. App. 1997). Thus, courts should refrain from deciding constitutional issues in the absence of an actual controversy requiring them to address the question. *See West v. Carr*, 212 Tenn. 367, 382, 370 S.W.2d 469, 475 (1963).

The parties in this case never joined issue with regard to the constitutionality of the newly enacted parental consent procedures. Accordingly, neither party had the opportunity to present evidence or legal arguments concerning this issue. Addressing

the constitutionality of Tenn. Code Ann. §§ 37-10-301, -307 was not necessary to deciding this case, and thus the trial court erred by reaching out to address the constitutionality of these provisions.

**F.**

The Planned Parenthood plaintiffs also take issue with the emergency medical exceptions in Tenn. Code Ann. § 39-15-202(h) and -202(d)(3). They point to two defects in these provisions. First, they point to the ambiguity created by the overlapping of the two provisions. Second, they take issue with the narrowness of their application. We have already determined that the trial court exceeded its authority by effectively amending these provisions and, therefore, that we must construe them as they were enacted by the General Assembly.

The wording of the emergency medical exceptions in Tenn. Code Ann. § 39-15-202(d)(3) and Tenn. Code Ann. § 39-15-202(h) differ slightly. The former provides an exception for circumstances that "would endanger the life of the pregnant woman;" while the latter permits exceptions when "necessary to preserve the life of the pregnant woman." Despite these differences, we find that both provisions cover circumstances where a woman's pregnancy is endangering her life. The legislative history contains no explanation for these redundant provisions, and we perceive no apparent need for Tenn. Code Ann. § 39-15-202(d)(3) because Tenn. Code Ann. § 39-15-202(h) applies to all provisions in Tenn. Code Ann. § 39-15-202, including Tenn. Code Ann. § 39-15-202(d). Redundancy in statutory language is not necessarily unconstitutional, and our construction removes any ambiguity concerning the operation or scope of Tenn. Code Ann. § 39-15-202(h).

Emergency medical exceptions are essential to the operation of abortion statutes. *See Planned Parenthood v. Casey*, 505 U.S. at 879, 112 S. Ct. at 2822. Accordingly, any regulation that will delay a woman's opportunity to obtain an abortion must contain a valid emergency medical exception. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 203 (6th Cir. 1997). In order to be valid, the exception must not only cover immediately life threatening conditions but also conditions that constitute a serious threat to a woman's health. *See Planned Parenthood v. Casey*, 505 U.S. at 880, 112 S. Ct. at 2822. Thus, the United States

Supreme Court approved an emergency medical exception when pregnancy so complicated a woman's medical condition that a delay in obtaining an abortion would create a serious risk of substantial and irreversible impairment of a major bodily function. *See Planned Parenthood v. Casey*, 505 U.S. at 879-80, 112 S. Ct. at 2822.

Tenn. Code Ann. §§ 39-15-202(h), -202(d)(3) cover only circumstances that threaten a woman's life; they do not cover medical conditions threatening a serious risk of substantial and irreversible impairment of a major bodily function. Thus, on their face, these emergency medical exceptions are too narrow to pass constitutional muster. Accordingly, we find that these provisions unduly burden a woman's constitutional right of procreational autonomy because they do not contain adequate provisions that will permit immediate abortions necessary to protect the woman's health.

## VI.

In the previous section we reviewed separately each of the challenged provisions in the statutes regulating a woman's procreational choice. Applying the undue burden standard formulated in *Planned Parenthood v. Casey*, we concluded that, with the exception of the emergency medical exceptions, the Planned Parenthood plaintiffs have not carried their burden of proving that each provision, standing alone, imposes an undue burden on a woman's procreational autonomy. Even though not directly raised by the parties, we have concluded that our review of the constitutionality of the challenged provisions cannot end with a review of each individual provision in isolation. Even though a particular provision, standing on its own, may pass constitutional muster, a combination of two or more of these provisions may unduly burden a woman's right to terminate her pregnancy when the effects of the provisions are considered together.

The evidence in this record demonstrates that the combined effects of the physician-only counseling requirement in Tenn. Code Ann. § 39-15-202(b) and the waiting period in Tenn. Code Ann. § 39-15-202(d) will place a substantial obstacle in the path of a large number of women seeking an abortion in Tennessee. The representatives of the Planned Parenthood clinics in Nashville and Memphis testified concerning the difficulty of recruiting physicians willing to perform abortions at their

clinics. Neither clinic employs full time physicians, and accordingly, they must contract with individual physicians or physician groups. These physicians have other practices, and their work at the clinics is clearly secondary.

The Planned Parenthood clinic in Nashville provides abortion services on Tuesday, Wednesday, alternate Thursdays, Friday, and alternate Saturdays. The clinic in Memphis provides abortion services on Tuesday and Thursday afternoons from 3:00 to 6:00 p.m. and on Saturdays from 9:00 a.m. to 2:00 p.m. In order to provide the necessary coverage, the clinics must contract with enough physicians who will be available to work during these times. Since most physicians maintain other practices, they are available to work at the clinic irregularly or infrequently. In addition, for reasons unrelated to the statutes, many physicians do not want the additional work and are concerned about the effects that working at the clinics might have on their own practices and with their relations with their patients and other physicians. Thus, it is quite common for physicians to agree to work at the clinics only one day every other week or on similar irregular intervals.

The medical staffing problems facing Planned Parenthood clinics would not appreciably increase the burden or inconvenience caused by either Tenn. Code Ann. § 39-15-202(b) or Tenn. Code Ann. § 39-15-202(d) considered alone. However, the staffing problems will exacerbate the burdens caused by the combined operation of these two provisions. If the clinics employed full time physicians, the expected delay in obtaining the procedure attributable to the statutes would be the length of the waiting period in Tenn. Code Ann. § 39-15-202(d). Conceivably, a particular woman's scheduling conflicts could cause some additional delay. These sorts of delays, however, are not substantively different from the delay involved with other elective surgical procedures, and they should not prevent a large number of women from obtaining an abortion during the first fourteen weeks of pregnancy.

The reality of employing part time physicians changes this picture significantly. When physicians work irregularly, the delay between the mandatory counseling and the procedure could very well be substantially longer than the minimum waiting period. If, for example, a physician works only every other week,[92]

_____

[92]The record contains evidence that the Planned Parenthood clinic in Nashville employs
(continued...)

-74-

a woman seeking an abortion would be delayed at least two weeks because she would be required to wait for the same doctor who provided her with the pre-abortion counseling to perform her abortion. This two-week delay could become extremely significant in light of the relatively short interval between the time a woman discovers she is pregnant and the end of her fourteenth week of pregnancy, after which she will no longer be able to obtain an abortion in a physician's office or outpatient clinic. This interval could be even shorter in the case of younger women who, according to the proof, tend to discover or confirm their pregnancies later than their older counterparts and who face additional obstacles to obtaining an abortion.[93]

Physician scheduling would not have the same impact if there were no mandatory waiting period. Women would be able to consult with a physician and have their abortion on the same day without being required to delay their abortion until the same physician was working. Similarly, if there were no requirement that the physician performing the abortion provide the required counseling, women would be able to obtain their counseling from any physician and then schedule their procedure with another physician as soon as the waiting period expired. The physicians' schedules would not be relevant in those circumstances because any qualified physician could perform the procedure even though he or she had not counseled the patient.

Nationwide, approximately 91% of abortions are performed within the first twelve weeks of pregnancy. In Memphis, however, 20% of all abortions are performed in the thirteenth or fourteenth weeks of pregnancy, as compared with 5% of the abortions performed in Nashville. The passage of time becomes important as a pregnancy progresses because the medical risks attendant to the procedure increase and because the opportunity to obtain a less expensive abortion in a physician's office or clinic rather than in a hospital may slip away. Thus, the possibility of introducing a delay of two weeks or more after the tenth week of pregnancy would amount to a substantial obstacle for a large number of women, especially younger women.

---

[92](...continued)
several physicians who provide abortion services at the clinic only one day every other week.

[93]Unemancipated women living at home face additional problems with regard to (a) obtaining the funds necessary to pay for the procedure, (b) discussing their pregnancy with their parents or seeking a judicial bypass of this requirement, (c) discussing their pregnancy with their sexual partner, and (d) finding the opportunity to be absent from school to obtain the counseling and the abortion.

Having determined that the combined effect of Tenn. Code Ann. § 39-15-202(b) and Tenn. Code Ann. § 39-15-202(d) causes an undue burden because of the staffing problems of the Planned Parenthood Clinics, we must decide whether we have any factual or legal basis for striking down either provision. The record provides no factual basis to do so because the Planned Parenthood plaintiffs have failed to prove that either requirement, standing alone, unduly burdens procreational autonomy. Likewise, because we have no reason to invalidate either provision on its face, we have no legal basis to strike down either provision. The resolution of this dilemma must be found in the Constitution of Tennessee itself.

Neither the state nor the federal constitution prevent the states from conditioning a woman's exercise of her right of procreational autonomy either on physician-only counseling or on a mandatory waiting period. It follows that deciding whether to establish either or both requirements is a public policy judgment for the General Assembly, not the courts, to make. Thus, Tenn. Const. art. II, §§ 1 & 2 require us to leave the choice between the two policies to the General Assembly rather than arrogating the General Assembly's powers for ourselves.

Our task as judges is to measure the product of legislative action against the requirements of the state and federal constitutions. We have performed our task in this case by determining that the combined effect of the physician-only counseling in Tenn. Code Ann. § 39-15-202(b) and the mandatory waiting period in Tenn. Code Ann. § 39-15-202(d) unconstitutionally burdens women's procreational autonomy by unduly delaying their ability to obtain an abortion. The General Assembly must decide which of these two policies is most important. However, until the General Assembly makes this choice, neither the waiting period in Tenn. Code Ann. § 39-15-202(d) nor the requirement in Tenn. Code Ann. § 39-15-202(b) that only physicians may provide the required pre-abortion counseling may be enforced.

## VII.

The State takes issue with the trial court's decision to award two court-appointed expert witnesses $27,600 in attorney's fees on the ground that the trial court lacked the authority to award these fees. We agree that the trial court does not

have the authority to require the State to pay the legal expenses of these court-appointed experts and, accordingly, vacate the award of these fees.

The trial court's perception of the role of Drs. Anthony Trabue and Betty Neff can best be described as novel. Shortly after this case began, these two physicians retained their own lawyer and sought to intervene in the case as parties to defend the constitutionality of the abortion statutes, especially the parental notification procedures that the Attorney General and Reporter was unprepared to defend. In September 1992, the trial court denied the physicians' motion to intervene but, relying on Tenn. R. Evid. 614 and 706, named them court-appointed experts for the defendants. At the same time, the trial court announced that it would appoint two court-appointed experts for the plaintiffs and requested the plaintiffs to designate the experts to be appointed.[94] In addition, the trial court stated that the lawyer retained by Drs. Trabue and Neff could continue to participate in pretrial discovery, examine all court-appointed experts and witnesses, file briefs, and participate in oral arguments.

Even though their lawyer appears to have focused much of his efforts on the parental notice provision in Tenn. Code Ann. § 39-15-202(f), both Drs. Trabue and Neff testified in detail in support of all the challenged provisions in Tenn. Code Ann. §§ 39-15-201, -202. In its initial opinion filed on November 19, 1992, the trial court struck down Tenn. Code Ann. § 39-15-202(f) and permitted Drs. Trabue and Neff to intervene as "limited parties" to defend the constitutionality of this procedure on appeal. Four months later, the physicians requested fees for their services as well as an additional $19,062.50 for their legal expenses. In April, 1993, the trial court awarded Dr. Trabue $7,725 and Dr. Neff $5,525 for their services.[95] It also awarded the physicians an additional $25,000 for their legal expenses.

Thereafter, Drs. Trabue and Neff, through their counsel, undertook to file a cross-claim requesting a declaration that Tenn. Code Ann. § 39-15-202(f) was constitutional even though the trial court had already struck down the provision. The

---

[94]While evenhanded, the trial court's decision seems to be somewhat inconsistent with the purpose of court-appointed experts which is to provide the trial court with neutral, unbiased experts who will provide more reliable expert opinions. *See* 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6302 (1997).

[95]The State has not taken issue with these fees on appeal.

trial court permitted them to file this cross-claim over the objections of the Planned Parenthood plaintiffs and the State and even allowed them to present evidence on this issue. The trial court's belated decision to accept proof on this issue created a procedural quagmire for the parties. Eventually, Drs. Trabue and Neff nonsuited their cross-claim without offering evidence of any sort. The trial court permitted them to dismiss their cross-claim but not before awarding them another $2,600 for their legal expenses.

All parties had numerous expert witnesses available to testify both in favor of and in opposition to the constitutionality of Tenn. Code Ann. §§ 39-15-201, -202. Accordingly, we question whether this case called for court-appointed experts, especially ones that had already allied themselves with the parties in the case. However, on the assumption that the trial court did not abuse its discretion by appointing these experts, we find no basis in the rules, the statutes, or the common law for reimbursing these witnesses for their own voluntarily assumed legal expenses. It was not the trial court's decision to designate them as court-appointed experts that prompted them to retain counsel. The physicians had already retained counsel by the time they were designated court-appointed experts, and they could have discharged their responsibilities as court-appointed experts without counsel.

Tenn. R. Evid. 706(b) permits the trial court to set reasonable compensation for court-appointed experts. This compensation is for their services as experts and does not include the collateral, voluntarily incurred legal expenses. The trial court's decision to designate them as court-appointed experts did not require them to retain counsel, and the record contains no evidence that they ever requested permission to seek legal advice or that they would have been unable to provide expert testimony without the assistance of counsel. Accordingly, Tenn. R. Evid. 706(b) provides no basis for the trial court's decision to require the State to pay Drs. Trabue's and Neff's legal expenses.

Attorney's fees are not recoverable in the absence of a statute or contract providing for their recovery or some other recognized equitable ground. *See Kultura, Inc. v. Southern Leasing Corp.*, 923 S.W.2d at 540; *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985); *State ex rel. Orr v. Thomas*, 585 S.W.2d 606, 607 (Tenn. 1979). When attorney's fees are awarded, they are awarded as

additional damages unless the statute or rule permitting them provides otherwise. In the absence of a statute or rule to the contrary, attorney's fees or other legal expenses are not costs. Accordingly, neither Tenn. Code Ann. § 20-12-119 (1994) nor Tenn. Code Ann. § 29-14-111 (1980) empower the trial court to order the State to pay the voluntarily incurred legal expenses of its court-appointed experts.

## VIII.

The trial court has broad discretion to award attorneys fees to prevailing parties in cases such as this one. When attorneys fees are sought, the trial court must first determine whether the party requesting the fees is a prevailing party and then must determine what fee would be reasonable under the facts of the case. Prevailing parties must obtain more than a technical, de minimis victory. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93, 109 S. Ct. 1486, 1493-94 (1989). They must succeed on a significant issue in the litigation and obtain relief that materially alters the legal relationship between the parties by obtaining some benefit the party sought in bringing suit. *See Farrar v. Hobby*, 506 U.S. 103, 111-12, 113 S. Ct. 566, 573 (1992); *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983); *McIntyre v. Traughber*, 884 S.W.2d 134, 138 (Tenn. Ct. App. 1994). The reasonableness of a requested fee depends on the facts of each case, *see Hail v. Nashville Trust Co.*, 31 Tenn. App. 39, 51, 212 S.W.2d 51, 56 (1948), and must be carefully analyzed using the factors in Tenn. S. Ct. R. 8, DR 2-106(B). *See Connors v. Connors*, 594 S.W.2d 672, 676-77 (Tenn. 1980); *Alexander v. Inman*, 903 S.W.2d 686, 695 (Tenn. Ct. App. 1995).

The question of the amount of attorney's fees to which the Planned Parenthood plaintiffs may be entitled should be revisited in light of the substantial modifications we have made in the trial court's disposition of this case. Accordingly, we direct the trial court to reopen the question of attorney's fees once this case is remanded. At that time, the trial court should permit the parties to present any evidence they have with regard to the plaintiffs' right to an award for their legal expenses and the amount of the award. The trial court should specifically consider the reasonableness of the requested fees with regard to possible duplication of services and the services relating to the challenge to the constitutionality of Tenn. Code Ann. § 39-15-202(f).

**IX.**

In summary, the combined results of our decision and the trial court's decisions either affirmed by or not appealed to this court are:

(1)    Tenn. Code Ann. §§ 39-15-201, -202 do not violate the Equal Protection Clauses of Tenn. Const. art. I, § 8 and Tenn. Const. art. XI, § 8 [see Section V(B)];

(2)    the requirement in Tenn. Code Ann. § 39-15-201(c)(2) that abortions performed after the fourteenth week of pregnancy be performed in a hospital is constitutional [see Section V(C)];

(3)    the residency requirement in Tenn. Code Ann. § 39-15-201(d) is unconstitutional;[96]

(4)    the requirement in Tenn. Code Ann. § 39-15-202(b) that a woman's attending physician must provide his or her patient with the information required in Tenn. Code Ann. § 39-15-202(b), -202(c) is constitutional [see Section V(D)(1)];

(5)    the information required to be provided to women seeking an abortion by Tenn. Code Ann. § 39-15-202(b)(1), (2), (3), (5), and (6) and Tenn. Code Ann. § 39-15-202(c) is constitutional [see Section V(D)(2)-(5)];[97]

(6)    the information required to be provided to women seeking an abortion by Tenn. Code Ann. § 39-15-202(b)(4) is unconstitutional;[98]

(7)    the mandatory waiting period in Tenn. Code Ann. § 39-15-202(d)(1) is constitutional based on the facts in this record [see Section V(D)(6)];

(8)    the parental notification requirement in Tenn. Code Ann. § 39-15-202(f) has been repealed by implication, and we express no opinion concerning the constitutionality of the parental consent requirement in Tenn. Code Ann. §§ 37-10-301, -307 [see Section V(E)];

(9)    the medical emergency exceptions in Tenn. Code Ann. § 39-15-202(d)(3), -202(h) are unconstitutionally narrow [see Section V(F)]; and

---

[96]The State has not appealed from the trial court's determination that this provision is unconstitutional.

[97]The Planned Parenthood plaintiffs have not appealed from the trial court's determination that Tenn. Code Ann. § 39-15-202(b)(1), (2) are constitutional.

[98]The State has not appealed from the trial court's determination that this provision is unconstitutional.

(10)   under the facts of this case, the combined effect of the physician-only counseling requirement in Tenn. Code Ann. § 39-15-202(b) and the mandatory waiting period in Tenn. Code Ann. § 39-15-202(d)(1) unduly burdens a woman's exercise of her procreational rights [see Section VI].

We remand the case for whatever further proceedings consistent with this opinion may be required, and we tax the costs of this appeal to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUDGE


CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
SAMUEL L. LEWIS, JUDGE